# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10-CR-00126 (01) JD |
| | ) | |
| MICHAEL SHENEMAN | ) | |

## MEMORANDUM OPINION AND ORDER

As discussed at the sentencing hearing on August 11, 2011, the Court now makes the following findings based upon the preponderance of the evidence and rules on Defendant Michael Sheneman's objections to the presentence report. For the reasons discussed *infra*, Michael Sheneman's objections are overruled.

### I. Loss Amount

Defense counsel first objects to the PSR's calculation of the amount of loss resulting from Michael Sheneman's criminal conduct, which the probation officer determined to be in excess of $1,000,000, resulting in a 16-level enhancement to Michael Sheneman's offense level, consistent with U.S.S.G. § 2B1.1(b)(1)(i).

Michael Sheneman was convicted of 4 counts of wire fraud involving 4 properties identified in the indictment (505 N. Walnut Street, 1246 Diamond Avenue, 726 S. Brookfield Street, and 1922 W. 6th Street). At trial, however, the government presented evidence on 60 properties that it alleges were sold as a part of the mortgage fraud scheme for which Michael Sheneman was convicted. During the sentencing hearing, the government submitted charts revealing that of the 60 properties, 36 properties were foreclosed upon ("sentencing exhibit 1"), and 47 properties were directly linked to Michael Sheneman who either provided a down payment or sold properties pursuant to a power of attorney ("sentencing exhibit 2"), as verified

by bank or sale records.  Testimony at sentencing established that despite the diligent efforts of the government's investigator (Mr. Richard Urbanowski, Forensic Auditor for the U.S. Department of Housing and Urban Development), no sales data is available for the 24 properties that were not foreclosed upon.  However, we do know that of those 24 properties, 11 were transferred to the banks pursuant to a deed in lieu of foreclosure.  Of the then remaining 13 properties, 6 were demolished by the city, 4 were sold at tax sale, and the disposition of the other 3 properties could not be determined because Mr. Urbanowski could not find information relative to subsequent transactions on the properties.  As a result, the Court cannot calculate the exact amount of loss resulting from the banks' disposal of these properties.  The government argues, though, that the Court can estimate the loss resulting from these properties based on the average loss sustained from those 36 properties that were foreclosed upon.

Application note 3 to section 2B1.1 explains how the guidelines compute actual loss. That note defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n. 3(A)(i).  Pecuniary harm is defined as monetary harm or harm that can be readily measurable in money but excludes emotional distress, harm to reputation, or non-economic harms. *Id*. at cmt. n. 3(A)(iii).  For pecuniary harm to be reasonably foreseeable, the defendant must have known or, under the circumstances, reasonably should have known, that the harm was a potential result of the offense. *Id*. at cmt. n. 3(A)(iv).  But the loss calculation need not be exact; "[t]he court need only make a reasonable estimate of the loss." *Id.* at n. 3(C).  "The estimate of the loss shall be based on available information, taking into account . . . factors such as . . . [t]he approximate number of victims multiplied by the average loss to each victim." *Id.* That note further states that the amount of loss should be reduced by "the amount the victim has

recovered at the time of sentencing from disposition of the collateral." *Id.* at (E)(ii); *accord United States v. Cage*, 365 F. App'x 684, 686 (7th Cir. 2010) (holding that in a mortgage fraud case, the amount recovered through the banks' sale of properties should factor into the calculation of actual loss).

The Seventh Circuit recently reiterated the appropriate method of calculating loss amount in a mortgage fraud case in *United States v. Green*, Nos. 09–3098, 09–3482, 09–3681, 2011 WL 3444435 (7th Cir. Aug. 9, 2011). The bank's loss for each property equals the amount of the original loan minus the sale price the bank received after it resold the property. *Id.* at *12 (citing *United States v. Radziszewski*, 474 F.3d 480, 486-87 (7th Cir. 2007)); *see also United States v. Serfling*, 504 F.3d 672, 680 (7th Cir. 2007) (applying *Radziszewski*).[1]

In addition, since loss includes reasonably foreseeable pecuniary harm resulting from the offense, § 2B1.1 cmt. n. 3(A)(i), the calculation of loss (and the number of victims for that matter, *see infra*) include conduct relevant to, but not specified within, the counts of conviction, § 1B1.3(a)(2). *United States v. Locke*, 643 F.3d 235, 243 (7th Cir. 2011). Thus, in the case of jointly undertaken criminal activity, whether charged as a conspiracy or not, the guidelines instruct that adjustments "shall be determined on the basis of . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B); *United States v. Salem,* 597 F.3d 877, 884-85 (7th Cir. 2010); *United States v. McKanry*, 628 F.3d 1010, 1020 (8th Cir. 2011) (finding relevant conduct where "[the defendant]

---

[1] Contrary to the government's argument, this precedent directs the Court to consider the properties' original mortgage amounts—not the judgment amounts—in computing the amount of loss. At sentencing, Mr. Urbanowski testified that the "judgment amount" listed on sentencing exhibit 1 includes principal, interest, and other costs. The guidelines, however, clarify that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." § 2B1.1 cmt. n. 3(D)(i).

was an active participant in the overall scheme to deceive the lenders" because "[h]is participation began by engaging in dual contracting, and continued with deceptively providing funds for the down payments, signing documents containing statements he knew to be false, and lying to [an investigator]"); *see also United States v. Hayes*, 574 F.3d 460, 483-84 (8th Cir. 2009) (affirming the district court's calculation that included loss resulting from reasonably foreseeable acts taken in furtherance of the conspiracy). In applying § 1B1.3(a)(1)(B), the district court must make a preliminary determination of the scope of the criminal activity the defendant agreed to jointly undertake. *Salem*, 597 F.3d at 886 (citations omitted). The district court must then make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity *and* reasonably foreseeable to the defendant in connection with the joint criminal activity. *Id*.

Moreover, uncharged conduct can be "relevant conduct" and may be used in determining loss amount if the conduct fits within § 1B1.3(a)(1)(B), and is part of the "same course of conduct" or "a common scheme or plan" as the offense of conviction. § 1B1.3(a)(2) cmt. n. 9; *Locke*, 643 F.3d at 243 (distinguishing cases in which the objective evidence and findings by the sentencing judge was either sufficient or deficient in supporting the relevant conduct finding). "Offenses are considered part of a common scheme if they involve 'common victims, common accomplices, common purpose, or similar modus operandi.'" *United States v. Brewster*, 390 F. App'x 557, 559 (7th Cir. 2010) (citing § 1B1.3 cmt. n. 9; *United States v. Perez*, 581 F.3d 539, 545 (7th Cir. 2009)).

In this case, the Court finds that the evidence presented at trial and sentencing establishes that Michael Sheneman did engage in mortgage fraud involving 60 properties, consistent with

§ 1B1.3(a)(1)(B) and (a)(2), as he was actively involved in a joint criminal undertaking with his son, Jeremie Sheneman, which was part of the same course of conduct or common scheme or plan to defraud.

The trial evidence showed that Michael and Jeremie Sheneman acted in concert to buy houses for a little (or gain a power of attorney over houses) and quickly sell them for a lot to turn a profit. Michael and Jeremie Sheneman, as evidenced by their actions, agreed to work as a team in this respect—Michael Sheneman often acted as the seller (or usually received a power of attorney to sell) and provided the financial backing to pad the buyers' bank accounts and to pay for the down payments, and Jeremie Sheneman falsified the loan documents which were sent to the lenders to secure mortgages.

This scheme is supported by the testimony of Tanya Boettcher and Lauren Duesler, who worked with Jeremie Sheneman at Superior Mortgage and testified that Michael Sheneman frequented Superior Mortgage multiple times each week. In fact, Ms. Duesler testified that Michael Sheneman told her that he was part owner of Superior Mortgage and that he and Jeremie Sheneman were selling some of his (Michael Sheneman's) houses. Ms. Duesler also saw Michael Sheneman use an office at Superior Mortgage, receive telephone calls at Superior Mortgage, and sit with buyers at the office with Jeremie Sheneman while Jeremie Sheneman filled out loan applications for the buyers. Ms. Duesler once observed Michael and Jeremie Sheneman accompany a buyer to the bank in order get a cashier's check for closing.

The evidence showed that Michael and Jeremie Sheneman obtained and (re)sold homes in similar fashion. Elinor Tyl, Eric McGinness, and Kevin Shaw, testified as to their experiences with selling their rental properties to Michael Sheneman or Jeremie Sheneman. Specifically, Ms.

Tyl reached an agreement to sell her properties to Michael Sheneman for a bulk price and executed a power of attorney for 5 of the 6 houses. Ms. Tyl received a personal check from Michael Sheneman for approximately $13,000, and she never received any other checks, although the evidence submitted indicated that other checks were written to Ms. Tyl with an endorsement with directions to "Pay to the order of Mike Sheneman".

Mr. McGinness made an agreement with Jeremie Sheneman, through a third person, to buy his Cleveland Avenue and Howard Street homes. Although Mr. McGinness was under the impression that he was selling the houses to Jeremie Sheneman, the evidence presented showed that he also executed a power of attorney to Jeremie Sheneman on the Cleveland home, and that a check was issued to Mr. McGinness which he never saw, but was endorsed with directions to "Pay to the order of Jeremie Sheneman". During the process of selling the 2 homes, Mr. McGinness met with Michael Sheneman at Tri State Mortgage, and Michael Sheneman indicated that if Mr. McGinness ever wanted to buy a bundle of properties, he could always come to Michael Sheneman.

So too, Mr. Shaw thought he sold 24 of his properties to Michael Sheneman at thirty thousand dollars a piece. But only after the closing did Mr. Shaw realize that the homes were not going directly to Michael Sheneman, but were being sold to buyers that he never met.

As to the buyers (and ultimately the victims, *see infra*), Paul Davies, David Doolittle, Gary Denaway, and Gladys Zoleko ("4 buyers"), testified as to their experiences with buying a total of 60 houses during the course of the scheme. Jeremie Sheneman told Ms. Zoleko about the money she could make being a landlord, indicated that the houses he was selling belonged to himself and Michael Sheneman, informed her that she would not have to pay the down

payments, and falsely promised to give her help renting out the properties and reselling them if she decided to get out of the landlord business. Jeremie Sheneman took care of the loan application, while Michael Sheneman twice took Ms. Zoleko around to look at properties to purchase but would not let her see all of the homes and told her not to write down the addresses of the homes that she selected. After looking at homes, Ms. Zoleko met with Michael and Jeremie Sheneman at Superior Mortgage. During this meeting, Jeremie Sheneman recommended that she buy 30 homes, and Michael Sheneman rolled his eyes and left. In response, Ms. Zoleko decided to purchase 14 homes, some of which she ultimately did not recall selecting and which turned out having extensive damage. Michael Sheneman was present at most of her closings and he was the one who always gave Ms. Zoleko the down payment checks.

Upon acquiring the properties, Ms. Zoleko received some money from rent, but she spent more money in repairing homes that were in unrentable condition and in paying the mortgage payments on the homes that were not generating rent. Ultimately, Ms. Zoleko testified that it would be too difficult to estimate the amount of money that she lost from the time she acquired the properties until the time that the foreclosures took place.

Mr. Davies met with Jeremie Sheneman to purchase rental properties and signed a single piece of paper, but never filled out any loan applications and never signed any other documents until closing. Jeremie Sheneman indicated to Mr. Davies that he and Michael Sheneman would get some of their properties ready, and then Mr. Davies would go see them. Michael Sheneman then took Mr. Davies to see properties the first time, but Mr. Davies was only able to go inside one house because Michael Sheneman told him that the others were occupied with renters. Jeremie Sheneman then took Mr. Davies on two trips, and again Mr. Davies was told he could

not see the homes because the renters did not want to be bothered.  Similar to Ms. Zoleko, Jeremie Sheneman falsely assured Mr. Davies that the homes were in good condition and that most had tenants or he would find a tenant.  Jeremie Sheneman attended the first two closings with Mr. Davies, and Michael Sheneman attended the third closing.  Mr. Davies remembered receiving money from Michael Sheneman in advance of the closing.

Mr. Davies, who acquired many properties which were in disrepair and all of which eventually became vacant, used his own money (until he ran out) to repair the properties and pay the mortgages.  Mr. Davies testified to losing "plenty of money" before the foreclosures took place.

Mr. Doolittle contacted Michael Sheneman to get involved in rental properties, and Michael Sheneman referred Mr. Doolittle to Jeremie Sheneman so that Jeremie Sheneman could fill out his credit and mortgage application.  Jeremie Sheneman again gave the buyer, this time Mr. Doolittle, false reassurances, including that the properties would be in good rentable condition and that they would have renters.  Mr. Doolittle met Jeremie and Michael Sheneman at a restaurant to discuss buying homes, and Jeremie Sheneman then showed him homes. Ultimately, Mr. Doolittle bought 21 properties, and Jeremie Sheneman provided the checks needed for closing to occur (with the money coming from Michael Sheneman, as discussed below).

After acquiring the properties, Mr. Doolittle ultimately worked 3-day weekends over the course of six to eight months repairing them with the help of his friends.  While Mr. Doolittle received some rent, he took out over one million dollars in mortgage loans and spent upward of forty thousand or more dollars to repair the homes that eventually went to foreclosure because he

could not make the payments.

Mr. Denaway contacted Michael Sheneman to get involved in the rental property business, which led to Mr. Denaway's contacting Jeremie Sheneman. Jeremie Sheneman sent Mr. Denaway out to look at houses and then met with him thereafter. Ultimately, Mr. Denaway chose 10 homes which he was told were in rentable condition, not all of which he was able to see on the inside because he was told that either a maintenance man was working on them or the key was not available. Michael Sheneman told Mr. Denaway that he would buy back the properties if Mr. Deneway was not happy, and Jeremie Sheneman told Mr. Denaway that the forty-five thousand dollars that was put into Mr. Denaway's account was Michael Sheneman's money and that it was deposited to make his credit appear acceptable. Further, even though Mr. Denaway lost his job, Jeremie Sheneman created a false employer so that Mr. Denaway would get approved for the loan. Mr. Denaway then attended 2 closings, and although Jeremie Sheneman never attended a closing, Michael Sheneman did.

Mr. Denaway, who did receive some rent money from some of the properties, spent at least forty-five thousand dollars repairing the properties. Eventually, he could not afford the properties and the homes went to foreclosure.

At trial, Mr. Urbanowski testified that in reality every cent of the money required to bring to closings for the down payments for all 60 properties purchased by Mr. Davies, Mr. Deneway, Mr. Doolittle, and Ms. Zoleko came from Michael Sheneman (minus some fees incurred for Ms. Zoleko's properties). 47 of these properties were directly tied to Michael Sheneman by way of a paper trail (sentencing exhibit 2). In addition, of the 60 properties purchased by the 4 buyers, virtually all of the mortgages (excepting 4 of Mr. Davies' properties) were brokered through

Superior Mortgage or Tri State Mortgage, where Jeremie Sheneman worked.  Mr. Urbanowski also analyzed the amount of money that was placed into the 4 buyers' accounts by Michael Sheneman, separate and apart from the down payment deposits, which included $20,000.00 to Mr. Davies (whose account balance was $869.00), $45,000.00 to Mr. Denaway (whose account balance was $694.00), $25,000.00 to Mr. Doolittle, and $18,000.00 to Ms. Zoleko (whose account balance was $234.00).  Mr. Urbanowski also testified that the proceeds of the sales often went to Michael Sheneman, yet that from June through October 2005, a total of $645,854.55 was transferred from Michael Sheneman's accounts to Jeremie Sheneman's accounts (although this amount was not actually traced from the money made from the property sales).

Consistent with *Salem*, this Court finds that the scope of the criminal activity that Michael and Jeremie Sheneman agreed to undertake involved the fraudulent sale of real estate, with each Defendant serving as an active participant in the overall scheme to deceive playing the role as detailed above. *Salem*, 597 F.3d 877 at 884-85.  Clearly, Jeremie Sheneman's conduct was in furtherance of that joint criminal activity, because without his enticing the potential buyers to buy multiple houses at once and falsifying the loan documents to secure the financing, the scheme would not have worked.  Moreover, Jeremie Sheneman's actions were reasonably foreseeable to Michael Sheneman in connection with the joint criminal activity, because Michael Sheneman was involved in various meetings with Jeremie Sheneman and the buyers, Michael Sheneman took buyers to see properties at the outset and then was present at most of the closings, and Michael Sheneman was aware that Jeremie Sheneman was securing fraudulent funding for unqualified buyers, because, but for Michael Sheneman's depositing tens of thousands of dollars into the buyers' accounts to inflate their balances, and but for Michael

Sheneman's obtaining certified checks to use at closing, the buyers would not have qualified for the mortgages and the closings would not have successfully occurred.

The conduct is undoubtedly part of a common scheme: it involves common victims—4 unsophisticated buyer victims who were not experienced with purchasing and managing multiple rental properties; it involves common accomplices—a father/son team who acted in concert by using their knowledge of the real estate business and the lending practices of subprime lenders; it involves a common purpose—to sell properties to the benefit of the Sheneman's by engaging in multiple acts of mortgage fraud; and, it involves similar modus operandi—falsification of mortgage loan applications, deposits to buyer bank accounts to enable them to qualify for loans, payment of down payments, etc.

As a result, the Court concludes by a preponderance of the evidence that the conduct involving all 60 properties sold to Mr. Davies, Mr. Denaway, Mr. Doolittle, and Ms. Zolecko is conduct relevant to Michael Sheneman and will be used in determining loss amount (and in calculating the number of victims, *see infra*). *See United States v. Cooks*, 589 F.3d 173, 185 (5th Cir. 2009) (holding that uncharged mortgage transactions qualified as relevant conduct because "they were the same type of mortgage fraud as those charged in the indictment and they include several common factors and people").

Exhibit 1 from sentencing includes data from the 36 properties that were foreclosed upon. Of these 36 properties, the bank sold three for an amount in excess of the original mortgage amount. The 33 properties foreclosed upon for a loss had an original mortgage amount totaling $1,693,000.00. The total amount bid at sheriff's sales was $1,032,149.50 (this number is referred to by the government as "foreclosure bid"). This left a deficit of $660,850.50. The 3

remaining properties had an original mortgage amount totaling $201,250.00, and the total amount bid at sheriff's sales amounted to $226,368.95, which resulted in the recovery of $25,118.95. When the deficiency amount of $660,850.50 is offset by $25,118.95,[2] then the deficit equals $635,731.55—an average loss of $17,659.21 per property ($635,731.55 divided by 36). As discussed at the sentencing hearing, the Court uses this per property average loss figure to estimate the loss for the remaining 24 properties for which there are no financial records. For those 24 properties, the deficit totals $423,821.04 ($17,659.21 multiplied by 24). All together, the deficits produced a total loss of $1,084,671.54 ($660,850.50 added to $423,821.04).[3]

As to the 4 buyers, they too suffered monetary losses in an amount equal to the time and money they spent repairing properties (despite assurances that they were in rentable condition upon their sale). Also, rents received did not cover the amount of money spent, which included not only repair work, but money spent to pay mortgages on various properties which did not have tenants (despite assurances that the properties would have tenants). In fact, during the sentencing hearing, Mr. Urbanowski agreed with defense counsel that the 4 buyers had out-of-pocket expenses that we cannot quantify today. Similar to the loss sustained on the original

---

[2] *See* § 2B1.1 cmt. n. 3(E)(ii) (loss shall be reduced by the amount the victim has recovered at the time of sentencing from disposition of the collateral). Admittedly, in some instances, the gain to an individual investor in the scheme is not used to offset the loss to another individual investor in the scheme. § 2B1.1 cmt. n. 3(F)(iv).

[3] The Court also notes that this calculation is a very conservative estimate, favoring the interests of Michael Sheneman. For instance, the Seventh Circuit has explicitly acknowledged that using credit bids based on fraudulently inflated loan amounts to measure loss would surely understate the actual loss. *United States v. Green*, Nos. 09–3098, 09–3482, 09–3681, 2011 WL 3444435 *12 (7th Cir. Aug. 9, 2011). However, due to the lack of sales data available, the most practical way to reasonably estimate the loss in this case is to use the original mortgage values less the amounts bid at sheriff's sales. Moreover, at sentencing, Mr. Urbanowski testified that 10 of the properties at issue were demolished by the city or sold at tax sale, which would have extinguished a large portion, if not all, of those properties' value and greatly reduced any recovery by the lenders. Mr. Urbanowski also testified at sentencing that the South Paulina Street property in Chicago, which was deeded to the bank in lieu of foreclosure, was ultimately resold for $50,000, which was $220,000 less than the value of the prior mortgage. However, even using these conservative loss figures, the amount of loss exceeds one million dollars.

mortgages, Michael and Jeremie Sheneman knew, or reasonably should have known, that the pecuniary harm suffered by the 4 buyers was a likely result of their jointly undertaken fraudulent scheme.

Accordingly, the enhancement under § 2B1.1(b)(1)(I) for causing a loss greater than $1,000,000.00 is appropriate, and Michael Sheneman's objection is overruled.

## II. Number of Victims

Defense counsel next challenges the PSR's application of an offense level increase under § 2B1.1(b)(2)(A)(i) for the offense involving ten or more victims. Defense counsel argues that Michael Sheneman was not involved in creating false loan applications, and therefore Michael Sheneman should not be held responsible for victimizing the mortgage companies [DE 87 at 5]. However, defense counsel admits that Michael Sheneman should be held responsible for victimizing the 4 buyers who purchased properties from him. *Id*. During the course of the sentencing hearing, defense counsel also acknowledged that while he would like to see only the 4 buyers counted as victims, there is no dispute that the entities listed in sentencing exhibit 1 (less 3 properties) did not get the full value of their original loans which ultimately resulted in a deficiency.

The application notes to section 2B1.1 define a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1)." § 2B1.1(b)(2)(A)(i) cmt. n. 1. *See also United States v. Knox*, 624 F.3d 865 (7th Cir. 2010) (citing these definitions); *United States v. Armstead*, 552 F.3d 769, 780-81 (9th Cir. 2008) ("in order to be counted as a victim, a person must have sustained a loss that is 'monetary or that otherwise is readily measurable in money'

and that loss must be included in the loss calculation") (quoting § 2B1.1 cmt. n. 3(A)(iii)).[4]

Victims who are eventually reimbursed does not negate their victim status. *United States v.*
*Panice*, 598 F.3d 426, 433 (7th Cir. 2010). And as discussed previously, Michael Sheneman can

be held responsible for conduct relevant to, but not specified within, his counts of

conviction—"that is, acts 'that were part of the same course of conduct or common scheme or

plan as the offense of conviction.'" *Locke*, 643 F.3d at 243 (citing U.S.S.G. § 1B1.3(a)(2);

*United States v. Smith*, 218 F.3d 777, 783 (7th Cir. 2000)). Again, a finding that the events fall

within § 1B1.3's purview, requires support by a preponderance of the evidence. *Locke*, 643 F.3d

at 244 (noting that in order for uncharged conduct to constitute relevant conduct, the acts must

have been both attributable to the defendant and also part of the single scheme common to the

counts of conviction).

　　　The law of this circuit and the guideline provisions allow the Court to count the banks

that held mortgages for the 60 properties at issue in this case, and the 4 buyers of those

properties, as victims of Michael Sheneman's conduct. Despite defense counsel's contention,

and as previously discussed at length, ample evidence at trial established Michael Sheneman's

direct involvement in the mortgage fraud scheme, as well as his knowledge of co-defendant

Jeremie Sheneman's fraudulent activities. *See supra* at 3-10. The evidence produced at trial and

sentencing reflects that Michael Sheneman paid the down payments for the purchase of the

homes and temporarily deposited money into the 4 buyers' bank accounts to artificially inflate

the account balances in an effort to induce the banks to make mortgage loans to the otherwise

unqualified buyers. Michael Sheneman drove the 4 buyers by properties that he indicated they

---

[4] "'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." § 2B1.1 cmt. n. 1.

could purchase (but not see) and/or directed the buyers to Jeremie Sheneman. Michael Sheneman knew that Jeremie Sheneman was falsifying the loan applications, as Michael Sheneman was providing the money needed to make the closings occur, many of which Michael Sheneman attended. The resulting loans which issued, enabled Michael Sheneman to sell his properties and the properties to which he had the power of attorney to sell to the buyers for his financial benefit. It was obviously, and in no uncertain terms, foreseeable to Michael Sheneman that his deposits would induce banks to make mortgage loans; indeed, that was his very intent. It was also foreseeable to Michael Sheneman that the unqualified buyers would be forced to make many unexpected repairs before the properties could be rented and make unexpected mortgage payments for the many properties that were without tenants—expenses which the buyers could not afford.

Here, sentencing exhibit 1 lists the holders of mortgages for the 36 properties foreclosed upon, which concerns 10 mortgage holders, 9 of which recouped less than the original mortgage amounts. The Court finds that these entities, along with the 4 buyers, constitute at least 10 separate entities which have suffered part of the pecuniary loss calculated previously. As a result, the Court finds that the two-level increase was properly applied, and overrules Michael Sheneman's objection.

### III. Sophisticated Means

Defense counsel also objects to an increase in the offense level under section 2B1.1(b)(9)(C) for the use of sophisticated means.

Application note 8 to that section defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense",

including, for example, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts". § 2B1.1 cmt. n. 8. The Seventh Circuit has "found that the enhancement is proper when the conduct shows 'a greater level of planning or concealment' than a typical fraud of its kind." *United States v. Knox*, 624 F.3d 865, 870-71 (7th Cir. 2010) (quoting *United States v. Wayland*, 549 F.3d 526, 528-29 (7th Cir. 2008)). The two-level enhancement "is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." *Knox*, 624 F.3d at 871 (citing *United States v. Jenkins,* 578 F.3d 745, 751 (8th Cir. 2009)). *See United States v. Wright,* 496 F.3d 371, 378–79 (5th Cir. 2007) (upholding adjustment when defendant inflated value of buyers' assets to defraud lenders); *United States v. Halloran,* 415 F.3d 940, 945 (8th Cir. 2005) (upholding adjustment when defendant forged numerous documents and notary stamps).

In *Knox*, the court found the application of this enhancement appropriate. 624 F.3d at 870-71. The court offered the following summary of the defendant's conduct:

> He deceived real estate buyers into purchasing overpriced properties by making promises he would never keep, and he lied to the sellers by telling them that he sold the properties for a lower amount than was true. He then tricked mortgage lenders into financing properties at prices far exceeding the real property value by falsifying the prospective buyers' loan applications with misinformation about the source of the down payment and providing the grossly inflated appraisals. . . . [The defendant's] coordination of various moving parts of the scheme and his ability to fool so many lenders into extending mortgages they otherwise would not have extended also speaks to the scheme's sophistication. . . . Moreover, [his] scheme required him to convince 21 lending institutions to extend grossly inflated mortgages to [his] buyers.

*Id.* In *United States v. Cross*, 273 F. App'x 557, 557-58 (7th Cir. 2008), the court similarly found the application of the offense level increase appropriate because the defendant and others

perpetrated a mortgage fraud scheme involving 35 mortgage loans provided by 23 banks and

residential lenders to purchase 17 residential properties in the names of straw buyers.  And in

*United States v. Dinnall*, 313 F. App'x 241, 245 (11th Cir. 2009), the Eleventh Circuit found the

increase warranted where the defendant misused her specialized accounting knowledge and

"misrepresented the financial status of borrowers using a method that convinced multiple

underwriters to approve [eleven] loans to otherwise ineligible persons."

      As established by precedent, Michael Sheneman did use "sophisticated means" within the

meaning of the guidelines.  The evidence at trial established that Michael Sheneman used powers

of attorney to avoid having property titles reflect that properties had had multiple property

owners within a short period of time.  During trial, Mr. Oswald agreed that such a disclosure

would have raised a red flag with lenders. *See* § 2B1.1 cmt. n. 8 (citing hiding transactions as

evidence to support a finding that sophisticated means were employed); *see also Knox*, 624 F.3d

at 872 (noting that "the use of fictitious entities, corporate shells, or offshore financial accounts"

is "[i]n no way . . . an exhaustive list of conduct required for a finding that a scheme was

sophisticated").  Additionally, Michael Sheneman surreptitiously deposited money into buyers'

accounts to "misrepresent[] the financial status of borrowers", just like the defendant in *Dinnall*.

313 F. App'x at 245.  In so doing, he "fool[ed] many lenders into extending mortgages they

otherwise would not have extended", like the defendant in *Knox*.  624 F.3d at 871.  And as

compared to the defendant in *Cross*, the scope of Michael Sheneman's scheme was much more

extensive—evidence at trial and sentencing links him to 60 properties and 60 mortgages, 47 of

which there is a paper trail of him either providing the down payment for or utilizing a power of

attorney to sell. 273 F. App'x at 557-58.  Michael Sheneman's scheme did not involve a single

fraudulent act, but a complex series of fraudulent transactions. To accomplish his multi-layered

plot, he took unsavvy unqualified buyers around town with the intent of having them buy

bundles of properties sight unseen, and his scheme required the use of a corporate mortgage

entity, numerous fraudulent and forged documents, and use of his own money for down

payments (which he later admitted to FBI Special Agent Tim Theriault he knew was not

permissible). This conduct also reflects Michael Sheneman's use of his specialized knowledge of

the mortgage industry, by virtue of his ownership of Superior Mortgage, and his frequent

presence at Superior Mortgage to disguise his transactions in order to secure loans and avoid

detection. *See Dinnall*, 313 F. App'x at 245 (citing the defendant's use of specialized

knowledge).

Because the evidence establishes that Michael Sheneman's conduct constitutes the use of

sophisticated means within the meaning of the guidelines, the application of a two-level increase

under section 2B1.1(b)(9)(C) is appropriate. Accordingly, Michael Sheneman's objection is

overruled.

### IV. Gross Receipts

Finally, defense counsel objects to a two-level increase in the offense level under section

2B1.1(b)(14)(A) for deriving more than $1,000,000.00 in gross receipts from one or more

financial institutions.

The two-level increase at issue applies when a defendant, individually, "derived more

than $1,000,000 in gross receipts from one or more financial institutions as a result of the

offense." § 2B1.1(b)(14)(A); *id.* at cmt. n. 11. "'Gross receipts from the offense' includes all

property, real or personal, tangible or intangible, which is obtained directly or indirectly as a

result of such offense." *Knox*, 624 F.3d at 873 (citing § 2B1.1 cmt. n. 11(B)). The term "financial institution" refers not only to banks, credit unions, and pension funds, but also to "any similar entity whether or not insured by the federal government." *Id.* (citing § 2B1.1(b)(2)(A)(i) cmt. n. 1); *see also United States v. Goodson*, 358 F. App'x 533, 536 (5th Cir. 2009) (defining "any similar entity" to include mortgage lenders); *United States v. Edelkind*, 467 F.3d 791, 801-02 (1st Cir. 2006) (same) (citations omitted).

In *United States v. Gharbi*, 510 F.3d 550 (5th Cir. 2007), the Fifth Circuit concluded that where the defendant unlawfully obtained mortgages for himself (by either borrowing money to buy a property from a straw seller or obtaining a loan for a straw buyer to purchase the property from him), the appropriate measure of "gross receipts" was the full face value of the loans. *Id.* at 555-56. Because the defendant was not permitted to use the existence of collateral as a discount for his sentence, the court concluded that "gross receipts consist of the entire amount of th[e] loan, less nothing." *Id.* at 555. *See also United States v. Sandlin*, 589 F.3d 749, 756 (5th Cir. 2009) (citing these conclusions approvingly where a defendant fraudulently obtained loans for himself). The *Gharbi* court also held that a defendant derives proceeds "where he causes them to be lodged in another with the expectation that he will enjoy the benefits." 510 F.3d at 556-7 (quoting *Edelkind*, 467 F.3d at 801) (noting that the gross receipts enhancement may be applied where the defendant either controls (even though indirectly) the fraud proceeds attributed to him or where he causes them to be lodged in another with the expectation that he will enjoy the benefits); *see United States v. Castellano*, 349 F.3d 483 (7th Cir. 2003) (proceeds to the company did not count toward the individual defendant's gross receipts where none of the money redounded to the defendant's benefit indirectly through the company's securities).

Applying these rules, the court explained that "the defendant "caused $247,000 to be lodged in the prior lienholder, and he enjoyed a commensurate benefit: the elimination of the previous lien. Without eliminating that lien, [the defendant] could not have closed on the sale, and he would not have pocketed an $85,500 profit." *Id.* at 556. The court therefore concluded that the defendant "derived the funds and used them for his purposes." *Id.* at 557.

Similarly, the court in *Serfling* upheld the district court's conclusion that "the gross receipts exceeded $1 million because [the defendant] obtained control of the [] property upon the loan's closing." 504 F.3d at 680 (noting that defendant became the owner of the property upon the closing of the loan and therefore the cash received and value of the property constitutes gross receipts). And in *United States v. Knox*, 624 F.3d 865, 873 (7th Cir. 2010), the court concluded that a defendant who fraudulently sold properties, like Michael Sheneman, rightly received a two-level increase because the court determined that "the amount of money [the defendant] received" exceeded $1 million.

Here, defense counsel argues that Michael Sheneman was only involved with 47 properties, not 60 properties, and therefore, any calculation of gross receipts may only encompass those 47 properties which are reflected on sentencing exhibit 2.

Although the Court has concluded, that by virtue of relevant conduct, Michael Sheneman was involved in the sale of all 60 properties, even accepting defense counsel's argument, the $1 million threshold is still surpassed. Referring to sentencing exhibit 2, which reveals the 47 properties that Michael Sheneman is linked directly to by way of bank or sale records (because he paid the down payment for or acted as a power of attorney for the properties), the total proceeds equal $2,405,841.69, and the total value of the mortgages obtained by the buyers is $2,707,450.00. Either of these figures would support the enhancement, consistent with the

reasoning in *Gharbi* and *Serfling*.

However, the Court could take an even more conservative approach, and eliminate from those 47 properties (listed in sentencing exhibit 2), the 13 properties which did not result in direct payment to Michael Sheneman as the seller of the property—that is, Michael Sheneman was not listed as the actual seller, nor did he have a power of attorney to sell. Limiting the calculation to only the "proceeds" received by Michael Sheneman from the 34 properties wherein he alone acted as the seller or the POA, then the proceeds from the mortgage loans would equal $1,602,882.32.[5] (In reality, the sale of these 34 properties wherein Michael Sheneman acted as the seller or POA, resulted in the buyers obtaining a total mortgage amount of $2,041,050.00).

Michael Sheneman's receipt of $1,602,882.32 in mortgage proceeds is established by the trial evidence. For the properties that Michael Sheneman owned, he received the proceeds when he sold them to the 4 buyers. As for those properties that Michael Sheneman sold pursuant to a power of attorney, the testimony at trial explained that pursuant to an agreement with the sellers, Michael Sheneman received the proceeds of those mortgages directly as well, paid off the sellers' old mortgages and any taxes due, and then pocketed the difference. Consistent with the holdings in *Gharbi* and *Serfling*, without eliminating the sellers' remaining liens, Michael Sheneman could not have closed on the sales, and he would not have pocketed the difference, therefore he controlled the fraud proceeds attributable to him.

Accordingly, the Court finds that as a result of Michael Sheneman's offense conduct and

---

[5]This conservative figure only includes the 34 properties wherein Michael Sheneman was listed as the "Seller/Payee" or listed in the "Endorsed to" column, and it does not include the $15,507.66 in proceeds received on 118 S. Meade Street, since the payment was endorsed to Jeremie Sheneman, and it does not include the $62,143.32 in proceeds received on 833 E. Dubail Avenue, since Michael Sheneman was listed only as a Trustee.

fraudulent actions, as detailed herein, the institutions approved these mortgages to unqualified buyers.  The lending institutions relied on the fraudulent representations in approving the mortgages, including the representations that the source of the down payments and the balance of the buyers' accounts were legitimate—misrepresentations which Michael Sheneman was very aware of since he provided those funds.  Because Michael Sheneman individually derived, either directly or indirectly, more that $1,000,000.00 in gross receipts from one or more financial institutions as a result of the offense, the increase under section 2B1.1(b)(14)(A) was properly applied, and Michael Sheneman's objection is overruled.

SO ORDERED.

ENTERED:    September 9, 2011   

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court