UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:10-CR-126 JD |
| | ) | Civil Case No. 3:12-CV-720 JD |
| MICHAEL SHENEMAN (01) | ) | |

## OPINION AND ORDER

Michael Sheneman ("Mr. Sheneman") and his son Jeremie Sheneman ("Jeremie") were convicted by a jury on four counts of wire fraud for their role in an elaborate mortgage fraud scheme. Mr. Sheneman was sentenced to 97 months of imprisonment, while Jeremie was sentenced to 120 months. Both defendants' sentences were affirmed by the court of appeals on direct appeal, and Mr. Sheneman has now moved for collateral relief under 28 U.S.C. § 2255. [DE 185]. That initial motion has been fully briefed. [DE 197, 210]. Mr. Sheneman has also filed two motions for leave to amend his § 2255 motion [DE 211, 221], the first of which has been fully briefed, [DE 213, 218], in addition to a "Supplement" [DE 243], a "Motion to Submit Newly Discovered Evidence [of] Actual and Factual Innocen[ce]" [DE 247], and an "Addendum." [DE 254]. For the reasons stated below, Mr. Sheneman's § 2255 motion is denied in part and taken under advisement in part. The parties are granted leave to supplement the record with affidavits or other evidence for the claims that remain at issue.

## I. BACKGROUND

The factual background of this case has been set forth extensively in prior orders by this Court [DE 111, 150, 166] and by the Seventh Circuit Court of Appeals. *United States v. Michael Sheneman*, 682 F.3d 623 (7th Cir. 2012); *United States v. Jeremie Sheneman*, 538 F. App'x 722 (7th Cir. 2013). Those facts, as set forth by the court of appeals on Mr. Sheneman's direct appeal, are as follows:

From 2003 to 2005, Sheneman and Jeremie worked in tandem to defraud both real estate buyers and mortgage lenders through a series of calculated misrepresentations. Generally speaking, their plan involved acquiring control over a large number of rental properties, inducing buyers to purchase the properties through a host of false promises, and ensuring that lenders would finance the purchases by falsifying loan documents and misrepresenting the buyers' financial standing.

Sheneman and Jeremie began by acquiring control over a large number of rental properties being sold by landlords in the South Bend and Mishawaka areas of Indiana. Many of these sellers had difficulty renting out their properties—some were in very poor condition—and were, by and large, simply looking to cut their losses and walk away from the homes with their mortgages and taxes paid. They agreed to sell their properties to either Sheneman or Jeremie, both of whom had a reputation for "flipping" homes and selling them at a profit. Although most sellers believed they had sold their properties directly to either Sheneman or Jeremie, the sellers had in fact merely granted one of the two power of attorney over their properties.[1] By exercising powers of attorney, Sheneman and Jeremie took control over the properties without ever appearing on any chain of title. The sellers, for their part, did not notice much of a practical difference. Each seller received the amount of money agreed upon as the selling price—albeit not from a title company, as would normally be the case, but directly from either Sheneman or Jeremie. After they "flipped" the houses and sold them to new buyers for more than the seller's asking price, Sheneman and Jeremie then endorsed and deposited the checks issued by the title company directly into their own accounts, yielding them hefty profits.

Once granted control, Sheneman and Jeremie then set about searching for buyers to purchase the dilapidated properties. Eventually, they found their marks, selling sixty properties to four buyers with no relevant real estate experience: Gladys Zoleko, a Cameroonian citizen in the United States on a student visa, bought fifteen homes; Paul Davies, a Liberian citizen also on a student visa, bought fourteen homes; David Doo[]little, an electrician, bought twenty-one homes; and Gary Denaway, a maintenance worker, bought ten homes. For each buyer, a very similar pattern of conduct transpired.

Sheneman and Jeremie made a wide range of promises to the buyers—false promises, as it turns out—in order to induce the sales. The buyers were all looking for an additional source of income, and Sheneman promised them just that. Significant profits could be made by purchasing homes and then renting them out—the more homes purchased, the bigger the profit. The homes were all in excellent condition, buyers were assured, and either Sheneman or Jeremie would make any necessary repairs. There was also little risk because most of the homes already had paying tenants living in them, and Sheneman and Jeremie would help

---

[1] Of the sixty homes, Sheneman purchased or was granted power of attorney over thirty-four homes. [All footnotes in original.]

find new tenants for vacant homes. And if the buyers ever wanted to get out of the real estate business, Sheneman and Jeremie promised to buy back properties that they no longer wanted. Perhaps most enticing of all, Sheneman and Jeremie also promised to cover all down payments and closing costs. The buyers, despite their relatively modest incomes, could therefore purchase a large number of homes and begin earning an immediate profit—without having to spend a dime out-of-pocket. They jumped at the chance.

The buyers, for their part, ignored some clear red flags. Most obviously, they were only permitted to see one or two of the properties they were purchasing prior to closing. The other homes, buyers were told, had tenants already living in them and a visit to those homes might disturb the tenants. But the buyers were assured that the other homes were all in similar condition and located in comparable neighborhoods.

Buyers filled out only minimal paperwork throughout the process. Sheneman brought each potential buyer to Superior Mortgage, a mortgage broker where Jeremie worked as a loan officer.[2] There, each buyer completed a few documents with some very basic information. Shortly thereafter, Jeremie informed the buyer that he or she was approved to buy a large number of properties. In order to ensure that mortgage lenders approved the loan applications, however, Jeremie falsified key parts of the documents. Among other misrepresentations, numerous loan applications falsely stated the buyers' citizenship, employment status, and finances, and the buyers' signature on many documents was often forged.

Beyond falsifying documents, Sheneman and Jeremie took other steps to secure financing from lenders and ensure the closings took place. First, they artificially inflated buyers' bank accounts, depositing tens of thousands of dollars in order to make it appear as though the buyers had sufficient assets to take on the loans. After the transactions were completed, the money was returned to Sheneman and Jeremie. Second, they masked the buyers' financial infirmities from lenders by utilizing certified checks to cover down payments and closing costs. Lenders therefore had no way of knowing that the buyers were not the true source behind these payments, as the loan documents contemplated.

After closing, each of the buyers quickly discovered that the deals they were promised were too good to be true. A number of the newly purchased homes were hardly habitable. Some had faulty plumbing, others had significant mold and

---

[2] Although only Jeremie was an employee of Superior Mortgage, Sheneman attended many of the buyers' meetings with Jeremie, and visited the offices often enough that some employees mistakenly believed Sheneman was a part owner of the business. [Technically, Jeremie was not actually an employee of Superior Mortgage, as he received no salary or commission, and his name did not appear as the loan officer on any of the loans that he originated. Rather, he originated loans through Superior Mortgage with the consent of its owner, Andrew Beam, and he listed Mr. Beam as the loan officer on each of the loan applications, which concealed his obvious conflict of interest from the lenders.]

termite damage, and yet others had structural damage and leaky roofs. Moreover, paying tenants were difficult to come by. Many of the homes did not have tenants living in them—despite previous assurances to the contrary—while others had tenants who never paid rent. Often, the few homes that the buyers had actually viewed prior to closing were not even included among the properties they had purchased. Many of the properties were also located in worse neighborhoods than the ones they had visited.

When the buyers contacted Sheneman and Jeremie to repair the homes or assist them in finding tenants, as they had promised to do, they were suddenly difficult to reach. The buyers' calls would often be ignored, or Sheneman and Jeremie would hang up when the buyers began complaining. In the end, Sheneman and Jeremie made very few repairs to the properties and reneged on their promise to buy any of them back. Unsurprisingly, each of the buyers was soon unable to make timely mortgage payments. Of the sixty properties: thirty-six were foreclosed upon, eleven were deeded back to the lender in lieu of foreclosure, six were demolished by the city, and four were sold in tax sales.[3]

Sheneman and Jeremie were indicted on October 13, 2010, and charged with four counts[4] of wire fraud in violation of 18 U.S.C. § 1343. After a four-day jury trial, they were convicted on all four counts. At sentencing, the district court calculated Sheneman's advisory sentencing guidelines range to be 87 to 108 months' imprisonment. In doing so, the court applied several sentencing enhancements, including enhancements for a loss amount of more than $1 million, using sophisticated means, having ten or more victims, and gaining more than $1 million in gross receipts from a financial institution. The district court then sentenced Sheneman to 97 months' imprisonment [and imposed restitution].

*Sheneman*, 682 F.3d at 626–28.[5]

The Seventh Circuit affirmed Mr. Sheneman's conviction and sentence on appeal, and

Mr. Sheneman has now timely moved to vacate, set aside, or correct his sentence pursuant to 28

U.S.C. § 2255.

---

[3] A forensic auditor for the Department of Housing and Urban Development, Richard Urbanowski, was unable to determine the status of the final three properties.

[4] Each count charged in the indictment identified one property sold in connection with the wire fraud. Thus, a total of four properties were identified in the indictment. At trial, the government presented evidence that sixty properties were sold as part of the overall mortgage fraud scheme.

[5] For a detailed summary of the testimony of each witness, see Docket Entry 150 (*United States v. Sheneman*, 2012 WL 1831551 (N.D. Ind. May 18, 2012)).

## II. STANDARD OF REVIEW

Section 2255(a) of Title 28 provides that a federal prisoner may claim "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, [and] may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States,* 366 F.3d 593, 594 (7th Cir. 2004) (citation omitted). Further, "a Section 2255 motion is neither a recapitulation of nor a substitute for a direct appeal." *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995) (citation omitted). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States,* 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States,* 467 F.3d 1063, 1068 (7th Cir. 2006)). Consequently, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4, Rules Governing Section 2255 Proceedings for the United States District Courts. A court may also deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

## III. PRELIMINARY MATTERS

As noted above, Mr. Sheneman has filed five separate amendments, supplements, or addenda to his motion since it became ripe. [DE 211, 221, 243, 247, 254]. The government only responded to the first motion for leave to amend, and addressed Mr. Sheneman's arguments on

their merits rather than opposing the amendment. The motions are each GRANTED to the extent that the Court will consider the arguments raised therein on their merits. The Court has incorporated the arguments raised in Mr. Sheneman's first and second motions for leave to amend, his supplement, and his addendum [ DE 211, 221, 243, 254] into its analysis below.

As to the "Motion to Submit Newly Discovered Evidence [of] Actual and Factual Innocen[ce]," the Court first notes that much of the "newly-discovered evidence" is not only not newly-discovered, but was actually admitted at trial. In any event, this filing seeks to establish Mr. Sheneman's actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995) and *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013). However, as the Supreme Court noted in those cases, "actual innocence" itself has never been recognized as a freestanding ground for collateral relief; it can simply be used to excuse a petitioner's procedural default so as to "allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin*, 133 S. Ct. at 1931; *Schlup*, 513 U.S. at 314 ("Schlup's claim of innocence . . . is procedural, rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, and the withholding of evidence by the prosecution, denied him the full panoply of protections afforded to criminal defendants by the Constitution." (internal citations omitted)). Here, the government has not raised procedural default as a bar to any of Mr. Sheneman's claims (though it could have, except as to the ineffective assistance of counsel claim), nor does the Court rely on that doctrine to dispose of any of the claims, as procedural default can itself be waived or forfeited. Accordingly, although this filing falls well short of establishing Mr. Sheneman's actual innocence, he does not need to establish cause to excuse a procedural default in the first place, so the Court need not further address this filing.

Finally, the Court notes that Mr. Sheneman's continuous filings do little except to delay the resolution of his petition. Just over a month after his initial motion became ripe on May 21, 2013, Mr. Sheneman filed his first motion for leave to amend. [DE 211]. After the government's response and Mr. Sheneman's reply, that motion became ripe on August 26, 2013. [DE 218]. Just over a month later, Mr. Sheneman filed his second motion for leave to amend on October 3, 2013. [DE 221]. After that motion became ripe upon the lapsing of the government's time for response, Mr. Sheneman filed a "Supplement," [DE 243], which was followed shortly thereafter by his motion to submit newly-discovered evidence, [DE 247], which was then followed by an "Addendum," [DE 254], which has yet to become ripe.

These recent filings have added little if any substance to Mr. Sheneman's arguments, and his own briefing on this matter already far exceeds 100 pages. Accordingly, if Mr. Sheneman wishes to further amend or supplement his motion, he must demonstrate good cause for his failure to raise the issue at the time of the initial filing of his § 2255 motion. Otherwise, except for the submissions the Court expressly requests below, the Court will not consider any further filings.

## IV. DISCUSSION

Mr. Sheneman seeks to vacate his conviction under 28 U.S.C. § 2255, which permits a court to vacate a judgment where "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). As a basis for his § 2255 motion, Mr. Sheneman alleges four violations of his constitutional rights: (1) ineffective assistance of counsel in violation of his Sixth Amendment right to counsel; (2) constructive amendment of the indictment in violation of the Fifth Amendment right to an indictment and his Sixth Amendment right to be informed of the nature and cause of the accusation; (3) improper jury instructions in violation of his Fifth Amendment

right to due process of law; and (4) solicitation of perjury in violation of his Fifth Amendment right to due process. The Court considers each in turn.

A.      **Ineffective Assistance of Counsel**

Mr. Sheneman argues that he was denied his right to the assistance of counsel, as guaranteed by the Sixth Amendment. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  To satisfy this right, an attorney must not only be present with a criminal defendant at his trial, but must assist the defendant in a way that ensures the trial is fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  A fair trial is one in which the adversarial process functions properly to produce a just result. *Id*. at 686.

To prevail on a claim for ineffective assistance of counsel, Mr. Sheneman must first demonstrate that counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 688).  "This means identifying acts or omissions of counsel that could not be the result of professional judgment.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir. 2011)).

Further, "there is a strong presumption that [the defendant's] attorney performed effectively," *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted).  The reasonableness of counsel's performance must be evaluated "from

counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel. *Yu Tian Li v. United States,* 648 F.3d 524, 528 (7th Cir. 2011) (citing *United States v. Lathrop*, 634 F.3d 931, 937–38 (7th Cir. 2011) (provided counsel's reasons for not questioning further were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient")); *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005).

Even if Mr. Sheneman establishes this first element, he must also demonstrate that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694); *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (same). "In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein*, 460 F.3d at 848 (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)). Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *Velarde v. United States*, 972 F.2d 826, 828 (7th Cir. 1992); *see Strickland,* 466 U.S. at 687 (reasoning that

"[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable").

Mr. Sheneman raises multiple grounds for his ineffective assistance claim, asserting that his appointed counsel, David Jones, was ineffective because he: (1) failed to investigate Mr. Sheneman's claims and introduce certain evidence that would have been favorable; (2) had a conflict of interest; (3) failed to object to a constructive amendment of the indictment; (4) failed to object to a jury instruction; (5) failed to object to perjured testimony; and (6) failed to raise certain arguments relative to Mr. Sheneman's Guidelines range and restitution at sentencing. Mindful of the fact that "ineffective assistance of counsel is a single claim no matter the number of attorney errors it is based on," *Peterson v. Douma*, No. 12-2924, 2014 WL 1778150, at *3 n.1 (7th Cir. May 6, 2014), the Court first addresses the arguments individually to determine whether they identify any potential errors or shortcomings that could possibly have had a prejudicial effect. Once the record permits resolution of each of those arguments, the Court will then assess any potential errors in light of the record as a whole to determine whether Mr. Sheneman's attorney was functioning as a counsel as guaranteed by the Sixth Amendment, and whether Mr. Sheneman was prejudiced by any potential deficiencies.

### 1. Failure to Investigate and Introduce Particular Evidence at Trial

The core of Mr. Sheneman's ineffective assistance of counsel claim is his argument that his attorney failed to properly investigate and to introduce evidence at trial that would have led to his acquittal.[6] In order to sustain an ineffective assistance of counsel claim based on his

---

[6] Much of Mr. Sheneman's argument in this regard rests on the premise that he is innocent, so his counsel must have been ineffective. For example, Mr. Sheneman states, "Petitioner Sheneman's counsel['s] errors in allowing Petitioner Sheneman to be convicted for crimes that he did not commit, while the perpetrators went free, is the sine qua non of ineffectiveness of counsel." [DE 185-3 p. 33]. Accordingly, he spends much of his briefing attempting to reargue the case, prove his innocence, and "solve" the case to identify the true perpetrators of the fraud. These

attorney's failure to investigate or to introduce favorable evidence at trial, Mr. Sheneman bears the burden of identifying the specific evidence that his attorney should have introduced and setting forth what that evidence would have shown at trial. *Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) ("It is firmly established that in order to succeed on a failure to investigate claim, the petitioner must demonstrate what the attorney would have discovered had a proper investigation occurred, as well as what evidence would have been introduced at trial."); *United States v. Ashimi*, 932 F.2d 643, 649–50 (7th Cir. 1991) (holding that to succeed on a failure to investigate or failure to introduce favorable evidence claim, "we must know what the attorney would have discovered after 'adequate' investigation" and what the purportedly favorable evidence would have been at trial);*United States ex rel. Partee v. Lane*, 926 F.2d 694 (7th Cir. 1991) ("[A] habeas court cannot even begin to apply *Strickland's* standards to [a failure to investigate or elicit testimony] claim unless and until the petitioner makes a 'specific, affirmative showing as to what the missing evidence or testimony would have been.'"). Accordingly, the Court begins its analysis by distilling from Mr. Sheneman's arguments the specific evidence and witnesses that he asserts his attorney should have offered.

Mr. Sheneman has identified the following alleged shortcomings in the presentation of his case, as summarized in his reply brief:

> Failure to interview and call witnesses Alan Butz and Jack Griffith to testify that even where the seller is available for closing, the use of power of atto[r]ney forms are commonplace, and not nefarious and deceptive, and are frequently used for rights to connect and disconnect utilities, pay taxes and obtain tax information, to

---

arguments are beside the point. The purpose of this collateral proceeding is not to determine Mr. Sheneman's guilt or innocence—he has already been found guilty of these offenses beyond a reasonable doubt, and his conviction has been affirmed on appeal. Rather, the purpose here is to determine whether any of his constitutional rights were violated in that process such as to require that his sentence be vacated, set aside, or corrected, so the Court focuses its analysis on those specific questions.

collect and disburse rental payments and to continue and/or assume maintenance contracts.

Failure to interview and call witnesses Alan Butz and Jack Griffith to testify that it is commonplace in the industry of buying residential real estate that property inspections are usually handled by property inspection firms, and that contact with property tenants, pre-closing is usually restricted.

Failure to introduce into evidence additional Power of Attorney forms to verify that Petitioner Sheneman was contractually restricted from allowing prospective buyers contact with property tenants, pre-closing.

Failure to introduce exculpatory documentation [including a mortgage application and a Truth in Lending packet] to verify that the California property had not been switched on Ms. Zoleko at closing.

Failure to call property tenants, and representatives of the utility companies and appraisal firms, to testify that every single home sold by Petitioner Sheneman, either directly or indirectly, was rented at the time that the house was sold.

Failure to interview and call South Bend property code inspector Stan Martinez [*sic*] to testify that all homes sold in South Bend owned by Petitioner Sheneman or controlled by him through powers of attorney, were up to code at the time they were sold.

Failure to interview and call as a witness the specified expert witness [in contract interpretation], who would have testified that the contract provided that homes were sold "AS IS", and that therefore, Petitioner Sheneman had no legal or contractual duty to make repairs to the homes, post-closing, and further that a party to a contract cannot unilaterally amend the obligations of the contract.

Failure to interview and call a forensic accountant to account for all the "down payment moneys" paid by Petitioner Sheneman to the home buyers as matching those amounts on the real estate purchase agreement.

Failure to interview and call as witnesses, each of the lender representatives involved in the actual loans relative to the Indictment and trial, who would have testified that the "down payment moneys" were fully disclosed to them in the closing Settlement Statements, and was not material to the issuance of the loans, due to the type of loan program utilized.

Failure to interview and call as witnesses Brenda Buck and Steve Kollar who were the perpetrators of mortgage fraud on the Gary Denaway loans.

Failure to interview and call a handwriting expert, who would have testified that the subject original mortgage applications were not forged, but were handwritten by Gladys Zoleko, and Lauren Duesler.

Failure to introduce prior inconsistent testimony of Lauren Duesler, and interview and call Andrew Beam as a witness to testify about rampant mortgage fraud at Superior Mortgage not involving Petitioner Sheneman nor Jeremie, and for other reasons state in Ground III herein.

[DE 210 p. 15]. Mr. Sheneman's filings further assert these alleged shortcomings:

Failure to call Liz Toban and Charlotte Johnson to testify that they had purchased properties from Mr. Sheneman and had no complaints. [DE 185-3 p. 20].

Failure to introduce the settlement statements from the closings to demonstrate that Mr. Sheneman's contributions were disclosed to the lenders. [DE 185-3 p. 29].

Failure to call Andrew Beam as a witness and introduce certain documents to show that Mr. Sheneman did not own Superior Mortgage. [DE 185-3 pp. 36–37].

Failure to call Andrew Beam as a witness to testify that he actually interviewed the buyers and personally signed their loan applications, and that Lauren Duesler and Gladys Zoleko, not Jeremie, made the false statements on the loan applications. [DE 185-3 pp. 40–42].

Failure to introduce a loan application that corrects a previous misrepresentation that the property would be owner-occupied. [DE 185-3 p. 36].

Failure to request a copy of a Form 302 report documenting Gladys Zoleko's interview with the FBI, and to impeach her with prior inconsistent statements contained in that report. [DE 211, 218].

To address each of these claims, the Court first addresses the items that Mr. Sheneman's counsel either did introduce at trial, could not have introduced at trial, or fully addressed to the extent relevant but through other means. The Court then details the remaining items for which there is any meaningful discrepancy between what defense counsel actually did and what he might have done, in order to determine whether such discrepancies could satisfy both prongs of the *Strickland* analysis.

### a. Evidence that Defense Counsel Did Introduce to the Extent Admissible and Relevant

A substantial portion of the evidence Mr. Sheneman faults his attorney for not introducing is evidence that either was actually introduced, that would have been wholly

immaterial or inadmissible, or that would have been cumulative to evidence that his counsel introduced to accomplish substantially the same ends through other means. Because there is no meaningful discrepancy between what Mr. Sheneman's counsel did and what Mr. Sheneman urges he should have done, they have no tendency to demonstrate ineffective assistance of counsel, and can be eliminated as potential bases for this claim.

### *Tyl Power of Attorney*

First, Mr. Sheneman argues that his counsel should have introduced the specific power of attorney signed by Elinor Tyl in order to demonstrate that he did not have the authority to permit the buyers to contact the tenants. Mr. Sheneman states that his attorney "surely clinched [his constitutional ineffectiveness] by failing to admit into evidence the Power of Attorney covering the houses to which Mr. Davies was denied entry," which "undoubtedly was not done by Petitioner Sheneman's trial counsel as a result of his lack of preparation in this case." [DE 185-3 p. 18]. Notably, however, Mr. Sheneman's counsel *did* introduce this document, and in fact placed great emphasis on it. [Defendant's Exhibits M-30, M-31]. The very first thing Mr. Sheneman's counsel did in his case in chief was to admit and publish to the jury the signed agreement between Ms. Tyl and Mr. Sheneman, which states, "It is expressly understood that NO ONE is to have any direct contact with or approach the tenants of any of the properties." [DE 78 pp. 5–6]. He returned to this exhibit in his closing argument, emphasizing that the reason Mr. Sheneman could not have shown Mr. Davies these homes was that he was expressly prohibited from doing so. [DE 78 p. 145]. Thus, Mr. Sheneman's attorney did exactly what Mr. Sheneman desired in this regard.

### *Expert Witness on Contract Interpretation*

Mr. Sheneman also argues that his counsel should have called an expert witness in contract interpretation, or in the alternative called Alan Butz and Jack Griffith, who he asserts have knowledge of the mortgage brokerage business, to testify that Mr. Sheneman had no duty to repair any of the homes after their sale since the purchase agreements stated that the properties were sold "AS IS." This argument fails for several reasons. First, to the extent Mr. Sheneman wants an expert witness to testify as to the legal implications of the contract, that would be inadmissible. "[T]he law (unless foreign) that a jury applies is the law given to it by the judge in his instructions, not the legal opinion offered by a witness, including an expert witness. District judges, rather than witnesses, must explain to juries the meaning of statutes and regulations." *United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009) (internal citations omitted).

Second, it is immaterial whether the purchase agreements imposed a duty on Mr. Sheneman to repair the properties after their sale. Mr. Sheneman was not charged with breaching a contract. Rather, the fraud charges arose out of Mr. Sheneman's and Jeremie's representations to the buyers that the homes were in good condition and up to Section 8 standards. The fact that they may not have had a contractual duty to repair the homes post-sale does not relieve them of accountability for fraudulent representations they made in order to induce the buyers into purchasing the homes. Finally, to the extent Mr. Sheneman simply wanted his attorney to demonstrate that the purchase agreements themselves were not the source of the fraudulent representations, he adequately made that point through his cross examination of Gary Denaway. Mr. Denaway admitted during cross examination that the purchase agreement stated that the properties were sold as-is and did not represent that they were Section 8 ready. [DE 77 p. 54]. In addition, nine separate purchase agreements were admitted into evidence for the jury's review.

[Defendants' Exhibits M-4, M-7, M-11, M-14, M-17, M-18, M-19, M-20, M-25]. Accordingly, the Court does not discern any appreciable shortcoming in defense counsel's presentation of Mr. Sheneman's case in this respect.

### Satisfied Customers

Mr. Sheneman further argues that his counsel should have called Liz Toban and Charlotte Johnson to testify about their positive experiences purchasing property from Mr. Sheneman. As the government rightly notes, however, this evidence would have been inadmissible. "Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) (holding that the exclusion of "evidence of [the defendant's] failure to engage in unlawful conduct" on other occasions was proper). Thus, the fact that Mr. Sheneman may not have made fraudulent representations to Ms. Toban and Ms. Johnson or to their lenders is not admissible to suggest that he did not do so in this instance either. Additionally, to the extent Mr. Sheneman wants to offer this as character evidence under Federal Rule of Evidence 404, Rule 405(a) only permits him to do so through testimony as to his reputation or in the form of an opinion, and he has not suggested that either of these witnesses would testify on those topics.

### Settlement Statements

Next, Mr. Sheneman states that his counsel should have introduced the settlement statements from the closings to demonstrate that the "Seller Contribution" was fully disclosed to the lenders. However, numerous settlement statements actually were admitted into evidence, including ten settlement statements from Ms. Zoleko's purchases [Government Exhibits 22–31], nine from Mr. Davies' purchases [Government Exhibits 1–9], three from Mr. Doolittle's purchases [Government Exhibits 18–20], and two from Mr. Denaway's purchases [Government

16

Exhibits 13, 14]. These included settlement statements from each of the indicted properties [Government Exhibits 9, 27, 30, 31] as well as six of the eight settlement statements Mr. Sheneman attached to his motion as allegedly having been omitted by his counsel [DE 185-8 (containing excerpts of Government Exhibits 9, 23, 27, 28, 30, 31)]. These exhibits amply demonstrated the point Mr. Sheneman wants to make, so his counsel did not fall short of Mr. Sheneman's requests in this respect.

### *Handwriting Expert as to Ms. Duesler*

Mr. Sheneman further states his attorney should have called a handwriting expert to demonstrate that Ms. Duesler's (the loan processor) and Ms. Zoleko's handwriting, not Jeremie's, appears on the loan applications. Mr. Sheneman asserts that this would show that Ms. Duesler and Ms. Zoleko made the fraudulent statements on the loan applications, not he or Jeremie. As to Ms. Duesler, however, an expert would not be necessary to establish this, as she admitted at trial that her handwriting was on a loan application. Specifically, Ms. Duesler testified on cross examination that she would sometimes have to copy loan applications by hand when the originals became illegible:

> Sometimes the application would be copied so many times or not legible and the lender would ask for us to -- they would need a clearer copy, so I would transfer the information on to the loan application. But I didn't complete, as far as sit down and fill out the application, because that's what's done in front of the client.

[DE 71 p. 108]. She was then shown one of the loan applications at issue and questioned as follows:

Q. Do you recognize those signatures?

A. No. *I know that I wrote his* [Andy Beam's] *name out*, but that's not a signature -- I would not sign, but I would write his name in because he was the person that was the inter- -- or the loan officer.

Q. You wrote his name in and somebody seemed to have written something below the words interviewer's signature. Did you fill that out?

A. Did I sign that?

Q. Yes.

A. No, I did not sign that. *It is required for them to be handwritten and signed, so I would handwrite – obviously it was on an application that wasn't legible and he had requested us to write it*, and then Andy would have to sign it. That would be a condition.

[DE 71 p. 111 (emphases added)]. Therefore, because this testimony was already before the jury by way of an admission, there would have been no need to call an expert to testify that Ms. Duesler's handwriting was on the application.[7]

### *Ownership of Superior Mortgage*

Mr. Sheneman further argues that his counsel should have introduced certain evidence to show that he did not own Superior Mortgage, including by calling Andy Beam as a witness and introducing documentation from the Secretary of State listing Mr. Beam as the sole owner of Superior Mortgage. This argument was prompted by brief testimony by Ms. Duesler that Mr. Sheneman was at Superior Mortgage at least three to four times a week, and that he told her he was a part owner. [DE 71 p. 78]. However, Mr. Jones did introduce evidence that Mr. Sheneman never owned Superior Mortgage. First, he cross examined Ms. Duesler extensively as to how she did not observe him taking part in Superior Mortgage's business. [DE 71 pp. 92–96]. Second, Jonathan Farkas, who had interacted with Superior Mortgage on behalf of Argent Mortgage, expressly testified that Mr. Sheneman was never an owner of Superior Mortgage. [DE 78 p. 15]. The other evidence Mr. Sheneman proffers on this issue would be cumulative to the evidence Mr. Jones did introduce, which effectively made the point Mr. Sheneman is pursuing.

---

[7] Notably, however, because her testimony was that she was only copying applications that had already been filled out, the fact that her handwriting appears on the application does not establish that Ms. Duesler made the false statements instead of Jeremie, as Mr. Sheneman claims.

In any event, whether or not Mr. Sheneman actually owned Superior Mortgage is immaterial. The significance of Ms. Duesler's testimony on this issue was not that Mr. Sheneman *was* an owner, but simply that Mr. Sheneman was around Superior Mortgage so often that he could be *mistaken* for its owner. This suggests that he was aware of the brokerage's role in the scheme to defraud, and that he was acting in concert with Jeremie instead of simply being a "bookend" on the transactions, oblivious to the fraudulent representations being made in the loan applications. Mr. Sheneman's focus on demonstrating that he did not own the company is thus misguided, and would not rebut the pertinent part of this evidence. Accordingly, the fact that his counsel did not introduce additional evidence on this point has no tendency whatsoever to show that his performance was deficient.

### *Discovery of Ms. Zoleko's 302 Report*

Finally, Mr. Sheneman argues in his First Motion for Leave to Amend his § 2255 that his counsel was constitutionally ineffective for failing to request a copy of the Form 302 report documenting Ms. Zoleko's prior statements to law enforcement agents. However, as the government points out in its response, and as Mr. Sheneman concedes in his reply, his counsel did have the report prior to trial, so he could not have erred by failing to request it after she testified. Mr. Sheneman accordingly argues in his reply that his counsel was ineffective for failing to use that 302 report to impeach Ms. Zoleko with prior inconsistent statements. Though several of the prior statements do not present inconsistencies at all, the Court includes the potentially impeaching statements in its analysis below.

### b. Evidence Not Introduced to the Extent Now Sought by Mr. Sheneman

The remaining evidence and witnesses for which there is at least some discrepancy between what defense counsel introduced at trial and what Mr. Sheneman now asserts should have been offered consist of the following:

Alan Butz and Jack Griffith, to testify that powers of attorney are commonplace and are frequently used for purposes other than when a party is unable to attend a closing; and that it is commonplace in the industry of buying residential real estate to restrict contact with tenants pre-closing and to rely on property inspections to ascertain the condition of the properties.

A signed loan application and a Truth in Lending packet for the California property, to show that the property was not switched on Ms. Zoleko.

The tenant of each property, and representatives of the utility companies, appraisal firms, and insurers, to testify that every home sold by Mr. Sheneman, directly or indirectly, was rented at the time it was sold; and utility bills from the properties to demonstrate the same.

Stan Melendez, to testify that all of the homes sold in South Bend owned by Mr. Sheneman or controlled by him through powers of attorney were up to code at the time of the sale.

A forensic accountant, to testify that all of the moneys provided by Mr. Sheneman in connection with the transactions were fully disclosed to the lenders on the purchase agreements.

The specific lender representatives who approved each loan at issue; to testify that the "down payment moneys" were fully disclosed to them in the closing Settlement Statements, and were not material to the issuance of the loans.

Brenda Buck and Steve Kollar, to testify that they perpetrated the mortgage fraud on Mr. Denaway's loans.

A handwriting expert, to testify that Ms. Zoleko's handwriting, not Jeremie's, appears on her loan applications.

Andrew Beam, to testify about rampant mortgage fraud at Superior Mortgage not involving either of the Shenemans; that he actually interviewed the buyers and personally signed their loan application; and that Lauren Duesler and Gladys Zoleko made any false statements on the loan applications.

Ms. Zoleko's 302 report, to impeach Ms. Zoleko with prior inconsistent statements that she signed a purchase agreement and probably three other forms at her first meeting with Jeremie, and that she had met Andy Beam at Superior Mortgage.

In arguing that the absence of this evidence from trial was not the product of constitutionally deficient performance, the government largely argues that Mr. Sheneman's counsel decided for strategic reasons not to offer this evidence. For instance, the government

surmises that defense counsel's overarching strategy was "to separate Michael Sheneman from Jeremie Sheneman in the minds of the jurors," and that many of these decisions were guided by that strategy. [DE 197 p. 8]. The government also notes that many of these witnesses may have been subjected to damaging cross-examination had they been called at trial, and that counsel acted reasonably in avoiding such witnesses. The government's assertions are generally consistent with the record, and if counsel was in fact motivated by those reasons and had based these decisions on reasonable investigation, they would likely fall in the category of sound trial strategy, and Mr. Sheneman will have failed to establish the first *Strickland* prong. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000) ("Certainly the decision not to call a witness to testify can be a strategic decision. Such a decision is sound 'if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant.'").

However, as Mr. Sheneman correctly notes, the government did not include an affidavit from Mr. Jones with its submissions, so its representations as to why counsel made the decisions he did are mere speculation. Nothing in the present record would allow the Court to find that all of these were strategic decisions based on reasonable investigation, so the Court cannot conclude on this basis that the failure to offer this evidence does not constitute deficient performance under the first *Strickland* prong. *See Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) (holding that while the party's argument "seems to show" that a witness was not called for

tactical reasons, "there is no affidavit or record evidence to support such a conclusion," so the ineffective assistance of counsel claim could not be dismissed on that basis).

The government also argues that given the substantial strength of the case against Mr. Sheneman, he cannot establish prejudice by demonstrating a reasonable probability that the result of the proceeding would have been different but for any shortcomings in the presentation of his defense. However, this argument overlooks the extensive nature of the evidence Mr. Sheneman now claims to have had available for his defense. This evidence would purportedly show that the homes were all occupied and in good condition at the time of the sale, that all of Mr. Sheneman's payments to or on behalf of the buyers were made with the full knowledge of the lenders, and that the Shenemans did not make and were not aware of any false statements on the buyers' loan applications. While the strength of the government's case would have still supported the jury's verdict at trial, if Mr. Sheneman can establish that the evidence in question would have had the same substance and strength as he now claims,[8] there would at least be a reasonable probability that the jury would not have convicted. Accordingly, the Court cannot resolve the second *Strickland* prong against Mr. Sheneman on this record, either.

In making these findings, the Court notes that Mr. Jones did make many of the points to which Mr. Sheneman's new evidence would apply, though not always in the same manner or to the same extent. Mr. Sheneman is dismissive of the government's arguments in this regard, stating that his claims are only based on what his counsel did not do, so what his counsel did do is irrelevant. That is incorrect. The Seventh Circuit "often ha[s] stated that 'it is essential to evaluate the *entire course of the defense*, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant

---

[8] As discussed further below, this is a rather large "if."

had the 'counsel' of which the sixth amendment speaks.'" *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) (emphasis added) (quoting *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009)). Thus, even if the Court ultimately finds that counsel erred in failing to offer any of the evidence in question, the evidence that he did introduce at trial would still inform the inquiry into both prongs of the Strickland analysis, as it is relevant to whether counsel's performance as a whole was constitutionally deficient, and whether Mr. Sheneman suffered prejudice from any errors. *Id.* However, because the adequacy of counsel's performance is judged in the aggregate, these discrepancies, even if minor, could collectively contribute to a finding of deficient performance and prejudice, so it is appropriate to consider such matters going forward.

Similarly, the Court notes that much of this additional evidence and testimony may be of marginal value, at least in isolation. For example, even if testimony conclusively showed that powers of attorney are widely used and that it is customary to prevent would-be buyers from looking inside investment properties prior to closing (which might rebut the suggestion that these practices are inherently deceptive), that would not prevent the government from convincingly arguing that the Shenemans took advantage of these practices and customs in order to effectuate their scheme to defraud. For the same reasons, though, the Court will consider the aggregate impact of any such evidence on Mr. Sheneman's claim as a whole.

Notably, however, the record is woefully incomplete on Mr. Sheneman's end too. While Mr. Sheneman has identified the witnesses he believes his attorney should have called, and in most instances stated what he expected their testimony to be, he has not submitted affidavits from any of those witnesses indicating that they would testify consistent with his representations. As the Seventh Circuit has clearly stated, a defendant who faults his attorney for failing to call a witness "cannot simply state that the testimony would have been favorable; self-serving

speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991); *Brown v. McGinnis*, 922 F.2d 425, 428 (7th Cir. 1991) (stating that to establish prejudice from an attorney's failure to call a witness, "the defendant must make a comprehensive showing of what the potential witness' testimony would have been and how it would have produced a different result. *This information should generally be presented to the habeas court in the form of actual testimony by the witness or an affidavit.*" (emphasis added)); *Wooten v. Hartwig*, 108 F.3d 1380, at *2 (7th Cir. 1997) ("Wooten failed to submit affidavits with his habeas petition setting out the potential testimony of these uncalled witnesses. We have only Wooten's word as to how they might have testified. Such speculation is not sufficient to support an ineffective assistance claim.").

While the Court does not believe that the absence of such affidavits from the record justifies the outright dismissal of the petition at this time, *see Wright*, 125 F.3d at 1044 (reversing the dismissal of a habeas petition that had not been accompanied by an affidavit from the would-be witness), neither do Mr. Sheneman's unsubstantiated claims about what these numerous witnesses would testify to require the Court to set a full evidentiary hearing on all of these claims. *Kafo v. United States*, 467 F.3d 1063, 1071 (7th Cir. 2006) ("[A] petitioner must establish some evidentiary basis for his claim before the district court is required by law to hold a hearing."). As the Seventh Circuit held in *Wright*, "The Supreme Court has also made it clear . . . that the district court has the prerogative of fashioning a course of proceeding short of a full-blown hearing to avoid the need for such a hearing." 125 F.3d at 1044 (citing *Bracy v. Gramley*, 520 U.S. 899 (1997), *Blackledge v. Allison*, 431 U.S. 63, 81 (1977), *Porter v. Gramley*, 112 F.3d 1308, 1317 (7th Cir. 1997), and *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). That is particularly appropriate here given the outlandish nature of some of Mr. Sheneman's claims, such as that

Brenda Buck and Steve Kollar, if called to the witness stand, would have confessed that they were the true perpetrators of the fraud in the loan applications at Tri-State Mortgage, and that Andrew Beam would have testified that he actually interviewed the buyers at Superior Mortgage and personally signed the loan applications, even though multiple witnesses credibly testified that the buyers never interacted with him.[9]

Therefore, because neither party has provided support for their claims so as to allow the Court to resolve the motion on the present record or so as to justify a full hearing, the Court will permit both parties to supplement the record with evidentiary support for their claims. Specifically, the government is encouraged to submit an affidavit from Mr. Jones addressing each of the evidentiary issues noted above, identifying his reasons for not offering the evidence in question, and describing the investigations upon which those decisions were based. Mr. Sheneman is likewise encouraged to submit affidavits from each of the purported witnesses, in which they swear under oath to what their testimony would have been had they been called as a witness at trial. If Mr. Sheneman is unable to provide such affidavits from any of the witnesses, he should submit an affidavit of his own providing any justification for his inability to procure the affidavits and identifying any objective basis for his belief about what those witnesses' testimony would be. The Court will allow the parties 60 days in which to file these submissions,

_____

[9] Other claims are even more speculative, such as that if Ms. Zoleko had been cross-examined in just one more respect, she would have recanted her testimony and testified in support of the Shenemans [DE 210 p. 6 ("It is possible that Ms. Zoleko would have testified that the September 2, 2005 mortgage application was forged, or that she was instructed not to open the truth in lending packet, but it is equally possible that she would have come clean upon seeing the exculpatory documentation and admitted that Petitioner Sheneman had not switched the property in question.")], or that had Mr. Beam been called to the stand, Mr. Sheneman's counsel "might have experienced a rare 'Perry Masonesque' moment, in being able to solve the crime before the jury's own eyes." [DE 185-3 p. 42]. Such pure speculation could easily be dismissed outright, but because the Court is giving Mr. Sheneman the opportunity to supplement his motion with evidentiary support, it will permit him to attempt to support these claims as well.

and 30 additional days thereafter to submit any counter-affidavits. The Court will then evaluate the supplemented record in order to determine whether an evidentiary hearing is necessary in order to resolve the motion.

This procedure is consistent with Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts, which states:

> **(a) In General.** If the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion. The judge may require that these materials be authenticated.

> **(b) Types of Materials.** The materials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits also may be submitted and considered as part of the record.

In addition, should the parties need to conduct discovery in order to produce any such materials, they shall comply with Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, which states:

> **(a) Leave of Court Required.** A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law. If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A.

> **(b) Requesting Discovery.** A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

The Court advises Mr. Sheneman that if he moves for leave to conduct discovery, he may be entitled to appointment of counsel. If Mr. Sheneman desires the appointment of counsel for the purpose of conducting discovery, he should so request in his motion for leave.

## 2. Conflict of Interest

Mr. Sheneman next argues that he was denied his Sixth Amendment right to counsel because his attorney had a conflict of interest. Mr. Sheneman alleges that his counsel previously

represented Andy Beam in an unrelated matter, and that this created a conflict of interest. Mr. Sheneman's filings indicate that Mr. Jones represented Mr. Beam in a criminal case filed in St. Joseph County, in which Mr. Beam was charged with rape, criminal deviate conduct, and child exploitation. [DE 210 p. 26]. The charges were filed on October 6, 2005, and on October 14, 2005, Mr. Jones and Martin Kus entered their appearances on behalf of Mr. Beam. The record does not reflect any further activity by Mr. Jones in this matter, as Mr. Kus appeared on behalf of Mr. Beam at each hearing. [DE 210 pp. 26–30]. Mr. Beam subsequently pled guilty to criminal deviate conduct, and on November 2, 2006, was sentenced to twenty years, fifteen of which were suspended, plus fifteen years of probation. [DE 210 p. 29]. Proceedings in the matter continued in order to address restitution, but on February 19, 2007, Mr. Kus filed a Notice of Withdrawal of Appearance, and another firm then entered its appearance on Mr. Beam's behalf.

Mr. Sheneman argues that this prior representation violated his Sixth Amendment right to counsel. The Sixth Amendment right to assistance of counsel includes "the right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). There are two methods under which a defendant can demonstrate that a conflict of interest deprived them of their Sixth Amendment right to counsel. First, under *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), a defendant's right to counsel is violated where his lawyer had "an actual conflict of interest" that "adversely affected his lawyer's performance." Second, a defendant may simply proceed under *Strickland* and demonstrate that a "potential conflict of interest" rendered counsel's performance deficient and prejudiced the defendant. *Enoch v. Gramley*, 70 F.3d 1490, 1496 (7th Cir. 1995). *Cuyler's* "adverse effect" is much easier to demonstrate than *Strickland's* "prejudice," but the threshold to proceeding under *Cuyler* is that the attorney had an "actual," rather than simply "potential," conflict. *Id.*

As the Seventh Circuit noted in *Enoch*, actual conflicts of interest are most common where an attorney simultaneously represents two codefendants in the same criminal case, since "exculpating one client may depend on inculpating the other." 70 F.3d at 1496. Actual conflicts of interest can also arise in cases of successive representation, though "it is generally more difficult to demonstrate an actual conflict" in those circumstances. *Id.* Specifically, actual conflicts may arise through successive representation "if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties. A corollary danger is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Id.* The Seventh Circuit has applied these principles by holding:

> To justify a hearing to demonstrate that [his attorney] labored under an actual conflict of interest under *Cuyler,* [the defendant] must at least allege facts that would show [(1)] that [his attorney's] representation of [the witness] was substantially and particularly related to his representation of [the defendant,] or [(2)] that [his attorney] learned particular information from his representation of [the witness] that was relevant to [the defendant's] case.

*Id.* at 1497.

Accordingly, to justify a hearing on his claim that Mr. Jones had an actual conflict of interest, Mr. Sheneman must allege facts showing either (1) that Mr. Jones' representation of Mr. Beam was substantially and particularly related to his representation of Mr. Sheneman; or (2) that Mr. Jones learned particular information from his representation of Mr. Beam that would be relevant to Mr. Sheneman's case. However, he has not made either showing. Mr. Jones' representation of Mr. Beam was in a case whose subject matter was wholly unrelated to any aspect of Mr. Sheneman's case. Mr. Beam was not charged with wire fraud or with anything relating to the mortgage or real estate industries, which are at issue here. This first factor typically requires that the successive representation be functionally equivalent to simultaneously

representing codefendants in the same matter, and that is simply not that case here. *Compare Enoch*, 70 F.3d 1490 (holding that no conflict existed where there was no factual relationship between the two matters and the representations were separated by several years), *with Hall v. United States*, 371 F.3d 969 (7th Cir. 2004) (holding that a conflict existed where the attorney previously represented an alleged co-conspirator of the defendant relative to the same offense), *and Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991) (finding an actual conflict where defense counsel previously represented another defendant in a matter that "was factually intertwined with the criminal defendant's case"). Therefore, the Court finds that Mr. Jones' representation of Mr. Beam was not substantially and particularly related to his representation of Mr. Sheneman such as to constitute an actual conflict.

For similar reasons, the Court cannot discern any indication that Mr. Jones may have learned particular information from his representation of Mr. Beam that would be relevant to Mr. Sheneman's case. The two matters were wholly unrelated, and there is no suggestion that Mr. Beam's role at Superior Mortgage or his relationship with the Shenemans might have arisen in any way in the other matter such that Mr. Jones might have learned confidential information relevant to this case. The record even shows that Mr. Beam did not meet with investigators relative to this case until July 2009, several years after Mr. Jones ceased representing him, so there is no reason to think that Mr. Jones would have learned any information relevant to this matter through his prior representation of Mr. Beam. Importantly, Mr. Sheneman has made no such allegation either.

Much of Mr. Sheneman's argument on this point is premised on the assumptions that Mr. Jones must have had some residual duty of loyalty to his former client or a duty to continue to protect Mr. Beam's interests, and that cross-examining a former client creates a *per se* conflict.

However, no such duties exist, and merely cross-examining a former client does not necessarily give rise to a conflict. *Enoch*, 70 F.3d at 1498 (holding that the attorney "owed [the former client] no general duty to protect [his] interests," and rejecting the claim "that any lawyer has a conflict of interest when he cross-examines a former client"). Accordingly, the Court finds that Mr. Sheneman has failed to allege facts sufficient to proceed on his argument that Mr. Jones represented him under an actual conflict of interest.[10]

Therefore, since *Cuyler* does not apply, Mr. Sheneman "must carry the heavier burden of showing that the [potential] conflict resulted in ineffective assistance under the familiar framework of *Strickland*." *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011). This means that Mr. Sheneman must "show that his attorney had a potential conflict of interest and that the potential conflict prejudiced his defense." *Hall*, 371 F.3d at 973; *Stoia v. United States*, 22 F.3d 766, 770 (7th Cir. 1994) (stating that a defendant can satisfy *Strickland* "by showing *both* that (1) his attorney had a potential conflict of interest and (2) the potential conflict prejudiced his defense"). This substantially overlaps with the question of whether counsel was ineffective for failing to call Mr. Beam as a witness, and for the same reasons discussed above, the Court cannot resolve this issue on the current record.

Though Mr. Sheneman included portions of a 302 report of Mr. Beam's prior statements, Mr. Beam's statements in that report contradict rather than corroborate Mr. Sheneman's claim that Mr. Beam would have testified that he acted as the loan officer on all the loans in question at Superior Mortgage, and that Jeremie did not make any of the false statements in the loan applications. [DE 185-21 ("Beam acknowledged that although he was listed as the LO [loan

---

[10] Mr. Sheneman's "Supplement" to his § 2255 motion is based on a state case from New York addressing the validity of a defendant's waiver of the right to conflict-free representation. [DE 243]. Having concluded that no conflict existed here, the Court need not consider whether any conflict was validly waived.

officer] and collected the commission on all these transactions, it was Jeremie that actually originated the loans. . . . Beam was shown a partial mortgage file on 2504 Kenwood and acknowledged the URLA was a standard form and appeared to be completed by Jeremie as it was Jeremie's handwriting on the form."); DE 185-22 ("Beam reiterated he did not review every Sheneman file.")]. Without some indication that Mr. Beam would have testified differently on these matters at trial, the Court would be unable to find that any potential conflict prejudiced Mr. Sheneman's defense. Conversely, without any indication from Mr. Jones as to why he declined to call Mr. Beam or what effect, if any, a potential conflict may have played in that decision, or if he was even aware of a potential conflict at the time, the Court cannot conclude that a potential conflict did not prejudice Mr. Sheneman. Therefore, the parties are encouraged to submit affidavits or other evidence supporting their positions on these questions along with the supplemental submissions described above. The Court will determine if a hearing is warranted on this issue based on the supplemented record.

### 3. Failure to Object to a Constructive Amendment of the Indictment

In the alternative to Mr. Sheneman's standalone argument that his conviction must be vacated because the indictment was constructively amended, which the Court discusses below, Mr. Sheneman argues that his attorney was constitutionally deficient for failing to raise that argument. However, for the reasons discussed in detail below, there was no constructive amendment of the indictment, or even a variance, since evidence at issue pertained to the same scheme to defraud as charged in the indictment and was fairly encompassed within its factual allegations. Accordingly, because an objection on those grounds would have been meritless, counsel was not ineffective for not raising it.

Mr. Sheneman relatedly argues that because the evidence of forgery is outside the scope of the offenses charged in the indictment, it constitutes Rule 404(b) evidence of other bad acts,

and should have been excluded. For this argument, Mr. Sheneman relies almost entirely on *United States v. Gorman*, 613 F.3d 711 (7th Cir. 2010), in which the Seventh Circuit abrogated the "inextricable intertwinement" doctrine. However, contrary to Sheneman's argument, *Gorman* did not alter the scope of 404(b), but simply held that direct evidence of the charged conduct does not implicate Rule 404(b), so resort to the inextricable intertwinement doctrine is unnecessary. *Id.* at 718–19 ("We again reiterate our doubts about the usefulness of the inextricable intertwinement doctrine, and again emphasize that direct evidence need not be admitted under this doctrine."). In fact, the court expressly stated that Rule 404(b) applies only where the government seeks "to introduce evidence that is not direct evidence of the charged conduct, but is instead evidence of 'other bad acts.'" *Id.* at 717. Here, for the same reasons the Court finds that neither a constructive amendment nor a variance occurred, the Court finds that this was not evidence of *other* bad acts, it was evidence of *these* bad acts. Accordingly, Rule 404(b) does not apply to this evidence, and counsel did not err by not raising such an objection.

### 4. Failure to Object to a Jury Instruction

Mr. Sheneman next argues that his attorney erred in failing to object to a jury instruction defining "scheme to defraud." The instruction at issue stated,

> A "scheme to defraud" is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another. A scheme to defraud encompasses not only false pretenses, representations or promises that were material, but also the omission or concealment of material information.

[DE 58 p. 19]. Mr. Sheneman specifically takes issue with the portion that states that a scheme to defraud can encompass "the omission or concealment of material information." As to concealment, Mr. Sheneman argues that the instruction is improper because it did not require "that such concealment be with the purpose to hide, mislead, avoid suspicion, or avert further inquiry." [DE 185-3 p. 49]. This argument is difficult to comprehend, as the instruction

specifically states that the scheme to defraud must be "intended to deceive or cheat another." [DE 58 p. 19]. Further, the Seventh Circuit expressly held on direct appeal that "[a] scheme to defraud requires the making of a false statement or material misrepresentation, *or the concealment of a material fact*." *United States v. Sheneman*, 682 F.3d 623, 628–29 (7th Cir. 2012). Thus, the instruction is accurate and contains the precise qualification that Mr. Sheneman requests, so the Court cannot discern any error in this regard to which his counsel should have objected.

Relative to the use of the term *omissions*, the Seventh Circuit has noted that "'merely failure to disclose' is not, without more, mail fraud." *Emery v. Am. Gen. Fin. Co.*, 71 F.3d 1343, 1347 (7th Cir. 1995). However, "a failure to disclose information may constitute fraud if the 'omission is accompanied by acts of concealment'" or by other misrepresentations. *United States v. Powell*, 576 F.3d 482, 491 (7th Cir. 2009). Thus, in this context, the statement in the jury instruction that a scheme to defraud encompasses the omission of material information is accurate.

In addition, jury instructions cannot be analyzed in isolation, but must be considered as a whole. *United States v. Swanquist*, 161 F.3d 1064, 1076 (7th Cir. 1998) ("In determining the correctness of jury instructions, a reviewing court 'must determine from looking at the charge as a whole, whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'"). When read as a whole, the jury instructions here unequivocally required the jury to find that Mr. Sheneman used "false pretenses, representations or promises," not merely omissions or even acts of concealment, to perpetrate the fraud. The jury was instructed as to each count that in order to find Mr. Sheneman guilty, it had to find that the government proved beyond a reasonable doubt:

First, that the defendant knowingly devised or participated in the scheme to defraud or to obtain money or property *by means of false pretenses, representations or promises*, as described in Count 1 of the indictment;

Second, that the defendant did so knowingly and with the intent to defraud; [and]

Third, that the *false pretenses, representations, or promises* were material[.]

[DE 58 pp. 10, 12, 14, 16 (emphases added)]. Therefore, even assuming *arguendo* that the jury could have considered mere omissions in determining whether a scheme to fraud existed, it had to find that the scheme operated "by means of false pretenses, representations or promises" in order to find Mr. Sheneman guilty. Further, the jury was instructed that the government was required to prove "one or more, but not all, of the *false pretenses, representations, promises and acts* charged in the count of the indictment describing the scheme." [DE 58 p. 19].

Additionally, the instruction states that a "scheme to defraud," which can encompass the omission of material information, must be "intended to deceive or cheat another." [DE 58 p. 19]. The words "deceive" and "cheat" both imply some sort of affirmative act, so it is difficult to see how a jury could find that an omission was "intended to deceive or cheat" without finding that it was accompanied by some other misrepresentation or act of concealment. *See Dictionary.com*, http://dictionary.reference.com/browse/deceive (defining "deceive" as "to mislead by a false appearance or statement"); *TheFreeDictionary*, http://www.thefreedictionary. com/cheat (defining "cheat" as "to deceive by trickery"). The Court further notes that this instruction is substantially similar to the Seventh Circuit Pattern Jury Instruction, which states, "A materially false or fraudulent pretense, representation, or promise may be accomplished by [an] omission[s] or the concealment of material information." (brackets in original). Therefore, Mr. Sheneman has not shown that the jury instructions were improper and would have warranted an objection at trial.

### 5.     Failure to Object to False Testimony

Mr. Sheneman further argues that his counsel was ineffective for failing to "catch" perjured testimony by six separate witnesses. His argument relative to the alleged perjury primarily claims that the prosecutor violated his Fifth Amendment right to due process of law by soliciting testimony he knew to be false. At the conclusion of that argument, however, he briefly mentions his ineffective assistance claim, stating in whole, "Nor did Petitioner Sheneman's counsel, ill-prepared for trial because of his utter failure to investigate Petitioner Sheneman's defenses, catch the vast majority of perjury that was occurring at the trial." [DE 185-3 p. 57]. This vague and conclusory statement is insufficient to raise an ineffective assistance of counsel claim, as Mr. Sheneman bears the burden of "identifying acts or omissions of counsel that could not be the result of professional judgment." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011); *see Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001) (holding that "a hearing is not necessary if the petitioner makes allegations that are 'vague, conclusory, or palpably incredible,' rather than 'detailed and specific.'"). Mr. Sheneman does not indicate how his counsel knew or should have known that the testimony was false, or what his counsel should have done to address it, so the Court need not consider this argument further relative to Mr. Sheneman's ineffective assistance claim. *Fuchs v. United States*, No. 13 C 50099, 2014 WL 1652151, at *13 (N.D. Ill. Apr. 24, 2014) (dismissing a claim that counsel was ineffective for failing to object to perjured testimony where the petitioner failed to allege "how or why his attorney would have been aware of that perjury in order to raise the issue"). In any event, the Court addresses below Mr. Sheneman's argument that the government knowingly used false testimony, and finds it to be without merit, so any objection or motion by defense counsel on this ground would have been denied.

### 6.    Ineffective Assistance at Sentencing

Mr. Sheneman finally argues that his counsel was ineffective at sentencing in two respects. First, that he failed to introduce evidence that Mr. Sheneman had no involvement with 20 out of the 60 homes, which would have affected the loss amount under § 2B1.1(b)(1) and the 2-level enhancement for gross receipts of more than $1,000,000 from a financial institution under § 2B1.1(b)(14)(A).[11] Second, Mr. Sheneman argues that his attorney failed to argue that the financial institutions were not victims of his offense, which would have affected the gross receipts from a financial institution enhancement under § 2B1.1(b)(14)(A) and the enhancement for more than 10 victims under § 2B1.1(b)(2)(A).

As to the first argument, Mr. Sheneman asserts that his counsel should have introduced evidence that he had no involvement in the sale of 20 of the 60 homes at issue, which he argues would affect the loss amount and the gross receipts from a financial institution enhancement, as well as the restitution. Mr. Sheneman is simply mistaken as to the gross receipts enhancement. Because the gross receipts calculation is not offset by the value of the collateral, Mr. Sheneman's gross receipts easily surpass the $1 million threshold whether he was responsible for only 40 properties or all 60. [DE 111 pp. 18–22]. In fact, the Court expressly noted in its order addressing Mr. Sheneman's objection to the Guidelines calculations that even if Mr. Sheneman was only held accountable for 34 out of the 60 properties,[12] his gross receipts would still equal $1,602,882.32, which is more than enough to trigger the 2-level gross receipts enhancement.

As to the loss amount and restitution, Mr. Sheneman asserts that his attorney should have called Steve Kollar and two other sellers to testify that Mr. Sheneman was not involved in the

---

[11] The Court refers to the Guidelines sections as they were designated in the 2010 Guidelines Manual, which was used to calculate Mr. Sheneman's guideline sentencing range.

[12] Those being the properties for which he was the "Seller/Payee" or for which the proceeds were endorsed to him. [DE 111 p. 21].

sale of 20 of the properties at issue, either as the seller or through a power of attorney, and should have called Brenda Buck to testify that neither of the Shenemans was involved in the loan application processes for those homes. As to Steve Kollar and the other sellers, their testimony simply would have been immaterial to these issues. The Court expressly recognized in its order on the Guidelines objections that Mr. Sheneman was not directly linked to all of the properties. [DE 111]. Regardless, the Court held that Mr. Sheneman's relevant conduct extended to all 60 homes because Mr. Sheneman "was actively involved in a joint criminal undertaking with his son, Jeremie Sheneman, which was part of the same course of conduct or common scheme or plan to defraud." [DE 111 p. 5]. Further testimony that Mr. Sheneman did not own every one of the homes would not change this analysis, so counsel was not deficient in failing to call these witnesses.

As to Brenda Buck, it is highly improbable that any testimony she would offer on this issue would affect the loss calculation or restitution award. As extensively detailed in the Court's orders on the Guidelines calculation and restitution award [DE 111, 112], substantial evidence supported the finding that the scheme to defraud extended to all 60 properties. The possibility of prejudice is further diminished since these findings must only be made by a preponderance of the evidence. However, the Court based its findings in part on the trial record and Mr. Sheneman is also challenging his attorney's failure to offer additional evidence at trial, the resolution of which could theoretically affect this analysis. Accordingly, the Court will refrain from ruling on Mr. Sheneman's sentencing argument relative to the loss amount and restitution until Mr. Sheneman has had the opportunity to submit affidavits in support of his claims.

As to the second argument, raised in Mr. Sheneman's second motion for leave to amend, Mr. Sheneman argues that the lenders should not have been considered victims of his offense,

since they loaned their money to the buyers who then gave it to the Shenemans. He bases this argument on *United States v. Stinson*, 734 F.3d 180 (3d Cir. 2013), a recent case out of the Third Circuit. As an initial matter, this case post-dates Mr. Sheneman's sentencing hearing, so it is difficult to comprehend how his attorney could have been ineffective for failing to raise it at sentencing. In any event, his argument that the lenders do not count as victims under the guidelines is meritless. The application notes to Section 2B1.1 of the Guidelines define "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)," and define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. n. 1, 3(A)(i). Nothing in the Guidelines requires that the loss amount flow directly from the victim to the defendant, so the fact that the buyers here were intermediaries between Mr. Sheneman and the lenders is simply irrelevant. *United States v. Knox*, 624 F.3d 865, 872 (7th Cir. 2010).

The same is true for gross receipts from a financial institution under § 2B1.1(b)(14)(A), which include "all property, real or personal, tangible or intangible, which is obtained *directly or indirectly* as a result of such offense." U.S.S.G. § 2B1.1 app. n. 11(B) (emphasis added); *Knox*, 624 F.3d at 873 (holding that this enhancement properly applied where the defendant's gross receipts from financial institutions came through the sale of his properties to third party buyers, who were the borrowers on the loans). *Stinson* is inapplicable, as the financial institutions there did not lend or part with any of their own money, they simply advised their clients to invest their money with the defendant, so the court found that the property the defendant received did not come directly or indirectly from the financial institutions. 592 F.3d at 187. That is not the case here, and it matters not whether Mr. Sheneman received the proceeds directly from the financial

institutions or indirectly through the buyers, so counsel was not ineffective for failing to raise this frivolous argument.

**B.**     **Constructive Amendment of the Indictment**

Mr. Sheneman next argues that his conviction must be vacated because the indictment was constructively amended. Specifically, he argues that the government constructively amended the indictment by introducing evidence of forgery in situations other than those expressly charged in the indictment. An indictment is constructively amended when a defendant is convicted for an offense separate from the one charged in the indictment. *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007). This occurs when "a 'complex set of facts' is presented to the jury during the trial which is distinctly different from the set of facts set forth in the charging instrument," such that "it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* A variance is a similar concept, and occurs when the government proves the same offense as in the indictment, but does so through "facts materially different from those alleged in the indictment." *Id.* This could occur, for example, if the government proves that a defendant committed wire fraud through the same scheme alleged in the indictment, but through a different wire transfer than alleged. *E.g.*, *id.* at 821; *United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006).

The line dividing these related concepts "essentially is between the situation in which different evidence supports the charged crime [as with a variance] and that in which the evidence supports a crime other than that charged [as with an amendment]." *Ratliff-White*, 493 F.3d at 820 (alterations in original) (quoting *United States v. Pisello*, 877 F.2d 762, 765 (9th Cir. 1989)). Here, a constructive amendment would be if the government only proved that Mr. Sheneman participated in a different scheme to defraud than alleged in the indictment, while a variance would be if the government proved the same scheme alleged, but with different facts than those

contained in the indictment. Both concepts implicate "a defendant's [Sixth] Amendment right to be informed of the nature and cause of the accusation against [him] and [his] [Fifth] Amendment right to indictment by grand jury." *Id.* at 819.

Mr. Sheneman argues that a constructive amendment or variance occurred through the introduction of evidence that either he or Jeremie forged the buyers' signatures on purchase agreements and mortgage applications. Mr. Sheneman specifically takes issue with Ms. Zoleko's testimony that she did not sign the purchase agreements, but that her signature may have been cut and pasted onto them, and that her handwriting is not on the loan applications. He also cites Ms. Duesler's testimony that she recognized Jeremie's handwriting on those loan applications, and the government's argument in closing arguments that the signatures on the purchase agreements were forged.

Crucially, however, this is all evidence of the same scheme to defraud as charged in the indictment, so there was no constructive amendment. Even if, as Mr. Sheneman suggests, the evidence of forgery was outside the scope of the indictment, that forgery was in furtherance of the same scheme to defraud charged in the indictment. An indictment is not constructively amended where "the evidence at trial concerned the same elaborate scheme to defraud . . . as was described in the indictment," even where that evidence differs from the specific facts alleged in the indictment. *Ratliff-White*, 493 F.3d at 821. Although Mr. Sheneman argues that these instances of forgery were not mentioned in the indictment, he does not argue that this forgery was connected to some scheme to defraud other than the one in the indictment, as would be required to constitute a variance. Indeed, he even notes that allegations of forgery were "the fabric that held the Government's entire case together" as to this scheme. [DE 185-3 p. 45].

Mr. Sheneman is further mistaken in arguing that a constructive amendment occurred because forgery is a separate crime, such that the jury could have convicted him for forgery instead of wire fraud. The jury was instructed that in order to find Mr. Sheneman guilty of any count, it had to find beyond a reasonable doubt that the government proved each of the elements of wire fraud as to that count. No instructions would have permitted the jury to convict Mr. Sheneman for forgery or for an offense other than wire fraud, so there was not a constructive amendment on this basis.

A variance did not occur here either, as all of the contested evidence was fairly encompassed by the allegations in the indictment. One of the allegations in the indictment was that "defendants Michael and Jeremie Sheneman set the price of the properties to be sold to the buyers, without negotiation with the buyers." [DE 1 ¶ 11]. Ms. Zoleko's testimony that she did not sign the purchase agreements but that her signature may have been forged or cut and pasted simply shows one way that the defendants committed this allegation—you do not have to negotiate with a buyer over the purchase price in a contract if you forge their signature on the contract. Likewise, as to the loan applications, the indictment charges that Jeremie "prepared loan applications for the buyers and intentionally omitted to disclose his role as the loan interviewer and application preparer;" "omitted to disclose on the buyers' loan application some or all of the buyers' other properties and corresponding mortgage loans;" "falsely listed on a buyer's loan application significant rental income from a recently purchased property;" "falsely inflated on buyers' applications the income of a buyer;" "falsely stated the buyer's employment on the buyer's loan application;" "misrepresented on a buyer's loan application the intended use of the property as a 'primary residence';" and "falsely stated on certain buyers' loan applications that the buyers were United States citizens." [DE 1 ¶¶ 15–21]. Testimony that Jeremie's

handwriting appears on the applications and that the buyers' signatures were forged or photocopied goes to show that it was actually Jeremie, and not someone else, who made each of those misrepresentations. Accordingly, all of the evidence at issue was directly relevant to the facts alleged in the indictment, so there was no variance.

Finally, the jury instructions removed any possibility that the jury convicted Mr. Sheneman for a different offense, or based on facts other than those charged in the indictment. The jury instructions expressly stated that in order to find Mr. Sheneman guilty, "it is essential that one or more, but not all, of the false pretenses, representations, promises and acts *charged in the count of the indictment* describing the scheme, be proved establishing the existence of the scheme beyond a reasonable doubt." [DE 58 p. 19 (emphasis added)]. This instruction prohibited the jury from convicting Mr. Sheneman for some offense other than the offense charged in the indictment, and similarly prohibited the jury from convicting Mr. Sheneman based on facts outside of the indictment. Therefore, neither a constructive amendment nor variance occurred. Because Mr. Sheneman's Fifth and Sixth Amendment rights were respected in this regard, Mr. Sheneman's motion is denied as to this claim.

## C.     Improper Jury Instructions

Mr. Sheneman further argues that his conviction was unconstitutional because the jury instructions' definition of "scheme to defraud" was impermissibly broad. The Court addressed this argument above in connection with Mr. Sheneman's ineffective assistance of counsel claim, but he also asserts that this constitutes a violation of his Fifth Amendment right to due process of law since it permitted the jury to convict him "for engaging in conduct that the law does not make criminal." *Buggs v. United States*, 153 F.3d 439, 444 (7th Cir. 1998); *Corcoran v. Sullivan,* 112 F.3d 836, 838 (7th Cir.1997). While the Court rejected this argument on the merits above, it

need not even reach the merits of Mr. Sheneman's argument in this context, since his counsel affirmatively waived his objection to this instruction at trial.

Waiver is the "deliberate relinquishment of a known right." *United States v. Richardson*, 238 F.3d 837, 841 (7th Cir. 2001). Courts will not "override the clearly expressed wish of a party or his lawyer, which may be backed by excellent strategic reasons, not to invoke a particular right." *Id.* Accordingly, an issue that is waived "is barred from receiving further judicial consideration, unless the lawyer violated his duty of providing his client with effective assistance of counsel." *Id.* (internal citations omitted); *United States v. Murry*, 395 F.3d 712, 717 (7th Cir. 2005).

Mr. Sheneman clearly waived his objection to the instruction here. The Court docketed its proposed jury instructions on April 25, 2011, a full week prior to trial, containing the instruction at issue. [DE 46]. Neither defendant filed any objections. After the government rested its case at the end of the third day of trial, the Court held an instruction conference on the record. The Court addressed each tendered instruction individually, and defense counsel stated that he had "No objection" to the instruction at issue. [DE 77 p. 238]. After incorporating various revisions, the Court tendered the revised instructions to the parties the following day, and confirmed with the parties after the close of evidence whether they had any objection as to each individual instruction. Again, however, defense counsel stated that he had "No objection" to this instruction. [DE 78 p. 104].

This clearly constitutes a waiver. The Seventh Circuit has "found waiver in a number of similar instances when the defendant or his attorney expressly declined to press a right or make an objection." *Murry*, 395 F.3d at 717 (collecting cases). In fact, the Seventh Circuit addressed a nearly identical factual scenario in *Murry*, holding:

> In this case, Murry waived his objection to the jury instruction at issue. The trial court asked Murry's counsel twice whether he had any objections to the instructions and twice he replied definitively that he did not. He was thus aware that he could lodge an objection and purposefully declined to do so.

*Id.* Here, after receiving ample time to review the instruction, the defendant twice replied definitively that he had no objection. Accordingly, Mr. Sheneman has waived his right to contest the instruction directly, and is limited to arguing that his counsel was constitutionally ineffective for waiving the objection, which the Court addressed above.

## D.    Solicitation of Perjury

Mr. Sheneman finally argues that the government violated his Fifth Amendment right to due process by soliciting testimony it knew to be false. "A conviction obtained through the knowing use of false testimony violates due process." *Morales v. Johnson*, 650 F.3d 588, 606 (7th Cir. 2011) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To obtain collateral relief on this basis, a petitioner must establish that: (1) there was false testimony; (2) the prosecutor knew or should have known it was false; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *Id.*; *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011).

In order to find that the testimony was false, "there does not need to be conclusive proof that the testimony was false or that the witness could have been prosecuted for perjury; all that matters is that the district court finds that the government has knowingly used false testimony." *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011).The Seventh Circuit has "repeatedly held, however, that 'mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.'" *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (quoting *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990)). Further, false statements cannot be looked at in isolation; rather, "when a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate

opportunity to expose the alleged perjury on cross-examination," and, by logical extension, whether that testimony was corrected or clarified on direct examination. *Saadeh*, 61 F.3d at 523 (citing *United States v. Adcox*, 19 F.3d 290, 295 (7th Cir. 1994), and *United States v. Santiago*, 798 F.2d 246, 247 (7th Cir. 1986)).

Here, Mr. Sheneman argues that six separate witnesses perjured themselves at trial, including Lauren Duesler, Gladys Zoleko, Paul Davis, Gary Denaway, Dave Doolittle, and Richard Urbanowski. Mr. Sheneman further argues that the prosecutor was aware of or perhaps even encouraged this alleged false testimony, and that it prejudiced his defense. The Court addresses each of these arguments in turn.

As to Mr. Duesler, Mr. Sheneman first argues that she perjured herself by testifying that "The only thing I really did with [Jeremie's] files were [*sic*] to complete the closing sheets for the lender," even though one of the loan applications may have been in her handwriting, and even though Mr. Beam told her she could kill any application she was uncomfortable with. [DE 71 p. 70]. However, Mr. Sheneman takes this statement out of context to try to suggest that Ms. Duesler testified that this was the only work she ever did on Jeremie's loan files. Her actual testimony was not so limited:

> Q. And how did that compare to the work that you did on Jeremie Sheneman's loan files?
>
> A. The only thing that I would do is if the lender would call and they would ask questions, then I would be there as a processor to answer them. And occasionally I would schedule the closings, but I basically – the only thing I really did with his files were to complete the closing sheets for the lender.

[DE 71 p. 70]. She also testified on cross-examination that she would sometimes hand copy the loan applications when they became illegible. [DE 71 p. 108–111]. Further, the fact that Ms. Duesler had authority over the loan applications does not contradict her testimony, it simply reinforces why she was uncomfortable when she perceived that Jeremie was overstepping her

authority. Accordingly, the Court does not find contradictions in this testimony, much less falsehoods that could have affected the verdict.

Mr. Sheneman next argues that Ms. Duesler perjured herself by minimizing her involvement with Apex Financial Group by testifying that "if we ever used them, it would have been very minimal, one or two." [DE 71 p. 103]. To disprove this testimony, Mr. Sheneman attached correspondence between Ms. Duesler and Apex Financial Group relative to two properties. Again, there is simply no inconsistency here. Any inconsistency on this question would have been immaterial, anyway, as whether Superior Mortgage processed all of the loans itself or assigned them to another brokerage for processing would not have contradicted the evidence that Jeremie was the loan officer on and originated all of the subject loans.

Mr. Sheneman further argues that Ms. Duesler testified falsely by stating that Jeremie's handwriting appeared on certain loan applications, and that certain signatures under Mr. Beam's name were not his. Even giving Mr. Sheneman the benefit of the doubt and assuming that the witnesses he now offers would testify that Jeremie's handwriting was not on the applications and that Mr. Beam had signed them, the weight of evidence to the contrary would have given the government ample basis to reasonably believe the testimony was true. All four buyers testified that they had not personally filled out the loan applications and that they had not met with Mr. Beam for that purpose. Ms. Zoleko also expressly testified that her handwriting was not on the applications in question, and even Mr. Beam's 302 report, which Mr. Sheneman attached to demonstrate the falsity of these statements, shows that Mr. Beam told authorities it was Jeremie's handwriting. [DE 185-21 (Mr. Beam stated that a loan application "appeared to be completed by Jeremie as it was Jeremie's handwriting on the form.")]. Therefore, given the substantial volume of evidence supporting Ms. Duesler's testimony, there is no basis on which to conclude that the

government should have believed it was false and refrained from offering it. *See United States v. Smith*, 223 F.3d 554, 574 (7th Cir. 2000) (holding that even if there were contradictions in the witness' testimony, "there was enough independent evidence corroborating [the witness'] testimony that the district court was entitled to conclude either that it was not perjured or, at the very least, the government would have had no reason to think it was perjured.").

Finally, Mr. Sheneman argues in several of his supplemental filings that Ms. Duesler lied by testifying that the Shenemans continued running Superior Mortgage after Mr. Beam's departure. This misstates the testimony. Ms. Duesler testified only that the Shenemans continued to come into the office after Mr. Beam's departure, and she also expressly testified that no one stepped in to continue the business of Superior Mortgage after that point. [DE 71 pp. 86–87, 113]. This testimony if fully consistent with Mr. Sheneman's version of the facts, and presents no falsehood.

Next, as to Ms. Zoleko, Mr. Sheneman first argues that she lied in testifying that some of the homes she intended to buy were switched out, and that she had not agreed to purchase the home on California Street prior to the closing. To refute this testimony, Mr. Sheneman argues that Ms. Zoleko executed a loan application for that property six weeks prior to closing, and that she had received a Truth in Lending disclosure ten days prior to closing. However, he has provided no evidence that Ms. Zoleko ever received a Truth in Lending disclosure for this property, and Ms. Zoleko also credibly testified that she never signed a completed loan application for any of the properties. This testimony was supported by the fact that the handwritten loan applications were photocopies of each other, save for the property addresses. The other three buyers similarly testified that they never signed any completed loan applications prior to closing, which corroborates her testimony. In his supplemental filings, Mr. Sheneman

argues that Ms. Zoleko's 302 report further demonstrates the falsity of this testimony because she stated that Mr. Sheneman told her to transfer the utilities for the California property in her name on October 14 or 15, 2005. However, the California property closed on October 14, 2005, so the fact that Mr. Sheneman talked to Ms. Zoleko the day of or the day after the closing does not contradict her testimony that she was unaware that she had agreed to purchase this property until the day of closing. Therefore, given the credibility and corroboration of Ms. Zoleko's testimony, the Court cannot conclude either that it is false or that the government should have known it was false.

Mr. Sheneman then asserts that Ms. Zoleko lied that she never signed a purchase agreement, citing solely to his unsupported assertion that it is mandatory to have a signed purchase agreement in order to close on a home. However, whether it is mandatory to have such a document does not mean that Ms. Zoleko actually signed it, as she credibly testified that she had not, and the other buyers corroborated her testimony with similar accounts. The fact that her 302 report indicates she previously stated she had signed "a purchase agreement form and probably three other forms" [DE 254-1 p. 3] merely presents an inconsistency, and does not establish either that her testimony at trial was false or that the government knew that. Mr. Sheneman raises similar arguments as to Ms. Zoleko's testimony that she never signed loan applications. For the same reasons, however, her testimony was credible, supported by substantial corroboration, and is not contradicted in any meaningful way by Mr. Sheneman's exhibits, so the Court cannot conclude that the government knowingly used false testimony in this respect.

In his Addendum, Mr. Sheneman asserts that Ms. Zoleko lied by answering "Never" to the question "Did there come a time when they asked you if you were a U.S. citizen?" [DE 72 p.

134]. To rebut this, he cites several documents on which her signature appears, which state she is a U.S. citizen. One of these, though, only states that she is a "U.S. person (including a U.S. resident alien)." [DE 254-1 p. 1]. Additionally, the fact that Ms. Zoleko signed documents at closing that stated she was a citizen was thoroughly explored through cross-examination, and was emphasized in closing argument. Furthermore, the fact that she signed these documents (which she testified she did not actually read) does not mean that the Shenemans ever asked her if she was a citizen, which is what she denied in this particular testimony, so the Court cannot conclude that this testimony was false.

Next, Mr. Sheneman argues that Ms. Zoleko, Mr. Davies, Mr. Denaway, and Mr. Doolittle all lied about the condition of the homes and that fact that not all of them had tenants. Again, however, even assuming that Mr. Sheneman could produce the evidence he now raises to show that the houses were occupied and in good condition, the buyers' credible and consistent testimony that some of the homes were in poor condition and that some of them were unoccupied would have certainly permitted the prosecutor to believe the testimony was true. Given the weight of the testimony on these points, the Court cannot find that this testimony was false or that the government knew that.

Lastly, Mr. Sheneman argues that the government knowingly used false testimony through Auditor Urbanowski's testimony that the loan proceeds from the 24 properties listed in Government Exhibit 35 went to the Shenemans, and through his testimony that Mr. Sheneman transferred over $600,000 to Jeremie, as reflected in Government Exhibit 46. Mr. Sheneman argues that the first statement was false because the Shenemans actually used most of the proceeds to pay off existing mortgages. This does not present any inconsistency, though, as Auditor Urbanowski was very clear about what he meant by "proceeds," and Mr. Sheneman's

counsel emphasized extensively on cross-examination that "proceeds" was not equivalent to

"profits":

> Q. Let's still talk about Exhibit 35 for a minute and this big number here that occurs on the bottom right-hand side, 1.1 million dollars. Okay?
>
> A. Okay.
>
> Q. I assume that -- maybe I shouldn't assume, but if we add up all the numbers on the right-hand side, are you telling the jury that is what that would add up to?
>
> A. Yes.
>
> Q. That is a check that was issued to the seller, correct, that is seller proceeds, right?
>
> A. Yes.
>
> Q. That's not seller profit. Would you agree?
>
> A. No. That's proceeds.
>
> Q. So could some of those numbers in the far right-hand column actually have resulted in a loss to Michael Sheneman?
>
> A. *That's just the amount of sales proceeds that were received at closing.*
>
> Q. Right. But if we wanted to know how much Michael Sheneman cleared -- or what his profits were -- we would need to subtract out a lot of things, wouldn't we?
>
> A. Yes.
>
> Q. Would you agree with me we would need to subtract out what he paid for the property?
>
> A. Yes.
>
> Q. Or all 24 properties actually, right?
>
> A. Yes.
>
> Q. And we would need to subtract out any work he might have done or any additions or improvements he might have put into the property?
>
> A. Yes, but *that column doesn't say "Profit." It says "Sales Proceeds."*
>
> . . .

Q. But if we would add another column called "Profit" that number could be a negative number or a positive number, correct?

A. Yes.

[DE 77 pp. 213–15 (emphases added)]. This testimony made abundantly clear what Auditor Urbanowski and Government Exhibit 35 meant by "proceeds," and Mr. Sheneman has presented no basis to call this testimony into question. Rather, Mr. Sheneman's argument merely takes issue with the inference that could be drawn from this testimony, namely that the Shenemans made substantial profits from these sales. However, this is not a basis for concluding that the government knowingly used false testimony, and in any event, Mr. Sheneman's counsel amply argued this inference at trial.

Mr. Sheneman's last argument is similarly flawed, as he argues that the money he transferred to Jeremie, as reflected in Government Exhibit 46, was not proceeds of the sales of the homes. Again, however, this misinterprets the testimony. Auditor Urbanowski did not testify that all these transfers represented proceeds of the sales of the homes, but simply that "funds were being transferred from Michael Sheneman's account to Jeremie Sheneman's accounts." [DE 188]. This showed a close financial relationship between the two, which supported the government's theory that they were acting in concert as part of the scheme to defraud. Thus, Mr. Sheneman's argument that these were not all loan proceeds does not contradict this testimony and does not establish that the government knowingly used false testimony.

Having considered each of the various statements that Mr. Sheneman asserts was false, the Court concludes that Mr. Sheneman has not established all three required elements of this claim as to any of them. Therefore, Mr. Sheneman has failed to show that the government violated his Fifth Amendment right to due process of law by knowingly using false testimony, and the Court denies his § 2255 motion in this respect.

## V.  CONCLUSION

Mr. Sheneman's motion to vacate, set aside, or correct his sentence under § 2255 [DE 185] is DENIED in part and taken under advisement in part. The Court GRANTS the parties 60 days, through July 25, 2014, to supplement the record with affidavits supporting their claims, and an additional 30 days, through August 25, 2014, to submit any counter-affidavits. The Court will assess the need for a full evidentiary hearing on the remaining claims at that time. Mr. Sheneman's motions for leave to amend his § 2255 motion [DE 211, 221] and his motion to submit newly-discovered evidence [DE 247] are GRANTED to the extent that the Court has considered the arguments and exhibits therein in evaluating his § 2255 motion.

SO ORDERED.

ENTERED:  June 2, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court